**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00010-MEH

DZHOKHAR TSARNAEV,

      Plaintiff,

v.

MERRICK GARLAND, Attorney General of the United States,
FEDERAL BUREAU OF PRISONS,
B. TRUE, Warden, ADMAX, and
JOHN DOES 1-20,

      Defendants.

---

**MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

---

ADX inmate Dzhokhar Tsarnaev killed and maimed Americans—including an eight-year-old boy and his six-year-old sister—at the 2013 Boston marathon. He is a confirmed devotee of al Qaeda. His actions in prison evince his continued adherence to violent jihad. Here, he claims that rules governing his communications violate the Constitution. All remaining claims in the Third Amended Complaint, ECF No. 11 ("TAC"), fail.

**BACKGROUND**

***Tsarnaev is an unrepentant jihadist who continues to advocate violence.*** Tsarnaev's devotion to violent jihad began long before the bombing. In the preceding months, he steeped himself in jihadist propaganda, accessing bomb-making instructions from *Inspire*, an al Qaeda magazine, and lectures given by the radical imam Anwar al-Awlaki, the al Qaeda jihadist who inspired many terrorists of Tsarnaev's ilk—including Fort Hood murderer Nidal Hassan and "underwear bomber" Umar Abdulmutallab. *United States v. Tsarnaev*, 968 F.3d 24, 85 (2d Cir.

2020); Ex. A, September 1, 2021 Special Administrative Measures ("SAMs")[1]; *see also*, *e.g.*,

*United States v. Hassan*, 742 F.3d 104, 149 (4th Cir. 2014); *United States v. Abdulmutallab*, 739

F.3d 891, 895 (6th Cir. 2014). Tsarnaev's preparation culminated in a day of unspeakable horrors:

> Together with his older brother Tamerlan, Dzhokhar Tsarnaev detonated two
> homemade bombs at the 2013 Boston Marathon, thus committing one of the worst
> domestic terrorist attacks since the 9/11 atrocities. Radical jihadists bent on killing
> Americans, the duo caused battlefield-like carnage. Three people died. And hundreds
> more suffered horrific, life-altering injuries. Desperately trying to flee the state, the
> brothers also gunned down a local campus police officer in cold blood.

*Tsarnaev*, 968 F.3d 24 at 34-35 (affirming multiple convictions and Tsarnaev's "many life

sentences"). Tsarnaev, deploying bombs that spewed "BBs, nails, metal scraps, and glass

fragments," turned the Boston Marathon into a "combat-zone." *Id.* at 36. His many victims

included eight-year-old Martin Richard, who bled to death on the sidewalk with his mother leaning

over him. *Id.* at 36. The consequences of Tsarnaev's heinous attack lives on. Martin's six-year-old

sister had her leg blown off. *Id.* at 36. She, and hundreds of others, have been consigned "to a

lifetime of unimaginable suffering." *Id.* Victims and their families have long-term physical and

---

[1] The Court may take judicial notice of facts regarding Tsarnaev's criminal background and court
proceedings in other cases that "have a direct relation to matters at issue" in this case. *St. Louis
Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979). The Court also may consider
Tsarnaev's SAMs on a motion to dismiss because they are referenced in the complaint, are central
to his claims, and the authenticity of the documents is not in dispute. *Gee v. Pacheco*, 627 F.3d
1178, 1186 (10th Cir. 2010); *Al-Owhali v. Mukasey*, No. 07-cv-02214-LTB-BNB, 2010 WL
5651033, at *10 n.3 (D. Colo. June 17, 2010), *adopted in relevant part*, 2011 WL 288523 (D.
Colo. Jan. 27, 2011), *aff'd*, 687 F.3d 1236 (10th Cir. 2012).
     Tsarnaev's August 2020 SAMs, which were in place when he filed this lawsuit, are
attached at Exhibit B. However, because Tsarnaev brings only official-capacity claims, only the
restrictions in his current SAMs are relevant. *See Facio v. Jones*, 929 F.2d 541, 544 (10th Cir.
1991) (a "plaintiff cannot maintain a declaratory or injunctive action unless he or she can
demonstrate a good chance of being likewise injured in the future"); *Farmer v. Brennan*, 511 U.S.
825, 845-46 (1996) (holding that "the inmate may rely, in the district court's discretion, on
developments that postdate the pleading and pretrial motions, as the defendants may rely on such
developments to establish that the inmate is not entitled to an injunction").

psychological injuries. *Id.* at 37, 80-81 (describing severed limbs, extreme pain, psychological terror, and one man who still has "a ball bearing stuck in his brain").

Immediately after the bombing, Tsarnaev went to the grocery store to buy milk so that he and Tamerlan could break a religious fast. *Id.* at 37, 39. The next day, Tsarnaev tweeted that he was "a stress free kind of guy." *Id.* at 37. A few days later, after law enforcement released videos of the brothers, Tsarnaev again used the knowledge he had gained from the bomb-making instructions in the al Qaeda magazine. *Id.* At that point, the pair "put pipe bombs, a handgun and a shrapnel bomb (similar to the ones they exploded at the Marathon)" in Tamerlan's car and drove past the Massachusetts Institute of Technology, where Tamerlan shot an MIT police officer "at close range—twice in the side of the head, once between the eyes, and three times in the hand." *Id.* Then, they carjacked a driver, who managed to escape and alert the police that the pair had bombed the Marathon. *Id.* at 37-38. When the police caught up with them, Tamerlan shot at the officers, one of whom nearly bled to death and spent months in the hospital. *Id.* at 38. For his part, Tsarnaev threw bombs at the officers, some of which exploded. *Id.* As it happened, while Tsarnaev was trying to make his getaway in the stolen car, he ran over Tamerlan, who died a few hours later. *Id.*

Hiding in a boat in a suburban Boston yard, Tsarnaev wrote manifestos proclaiming that "we Muslims are one body, you hurt one, you hurt us all," and asserting that Islam allowed the killing of the innocent people he had murdered. *Id.* at 38. Eventually, the homeowner discovered him and called the police, who finally extricated Tsarnaev from the boat with flash-bang grenades and bullets. *Id.* Tsarnaev was saved by medical providers. *Id.* at 39.

Tsarnaev "conceded that he did everything the government alleged," *id.* at 34, and there is nothing to indicate he has reneged on any of it. After the bombing, during an FBI interview, he

"reaffirmed [his] commitment to jihad and expressed hope that [his] actions would inspire others to engage in violent jihad." Ex. A at 3. He has made light of the gravity of his crimes, suggesting during a supervised visit with his sister that he would encourage others to "buy a pressure cooker." *Id.* More than two years after his horrific crimes, he wrote "the jihad continues" on the wall of a BOP cell. *Id.* In 2018, he was caught in his ADX cell with a concealed "homemade weapon fashioned from a razor, plastic, and tin foil wrappers." *Id.*

Tsarnaev has been, and continues to be, a source of inspiration to persons who are infatuated with him. At his behest, three associates, all of whom pled guilty or were convicted after trial, attempted to destroy evidence and obstruct the government's investigation after the bombing. *Id.* He has a large fan base outside the prison from whom he continues to receive "unsolicited 'fan' mail," and who want to engage in continuing correspondence with him. *Id.* He has tried to circumvent communications rules, as has at least one member of his family. *Id.* (noting that Tsarnaev's mother, who lives in Russia, disseminated to media her recorded phone conversation with him). He has attempted to send items he has hand-crafted—obvious potential propaganda tools for like-minded jihadists—to persons with whom he is not approved to communicate. *Id.*

***Tsarnaev's SAMs.*** The Attorney General has imposed Special Administrative Measures ("SAMs") on Tsarnaev pursuant to 28 C.F.R. § 501.3, based on a finding that there is a substantial risk that Tsarnaev's contacts with people outside the prison "could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons." *See* Ex. A at 1. The SAMs detail the Attorney General's assessment of Tsarnaev's history of domestic terrorism and the risk of violence and harm to the public that his unrestricted communications would pose. *Id.* at 2-4. The Attorney General summed

up the assessment of Tsarnaev's dangers, *id.* at 4:

> [Tsarnaev's] criminal conduct, and statements before, during, and subsequent to [his] trial and sentencing demonstrate that [he] remain[s] an unrepentant and committed terrorist. In addition, [his] continued attempts to circumvent the SAM, as well as high profile status among certain individuals reveal [his] unrestricted communications would continue to pose a substantial risk of violence and harm to the public.

The SAMs allow Tsarnaev to communicate with members of his immediate family, which include his parents and two sisters, as well as nine nieces and nephews. He can have in-person visits with his immediate family, his nine nieces and nephews, and his attorneys. *Id.* at ¶¶ 2.c, 3.f. He can exchange written correspondence with his attorneys, members of his immediate family, and his six nieces and nephews who reside with his sisters. *Id.* ¶¶ 2.i., 3.g. He can speak by phone with his attorneys and members of his immediate family. *Id.* ¶¶ 2.g., 3.a.i. Tsarnaev may request additional contacts who are evaluated "on a case-by-case basis." *Id.* at 9 n.7.[2] The Attorney General found that these measures are reasonably necessary to prevent Tsarnaev from committing, soliciting, or conspiring to engage in additional criminal activity; to prevent him from receiving and acting upon critically timed messages; and to prevent him from advocating or inciting terrorist, criminal, or violent activities. *Id.* at 16-17.

***Grounds for dismissing remaining claims.*[3]** In Claims 1, 2, and 3, Tsarnaev alleges that certain provisions within the SAMs violate his First Amendment rights. But the Tenth Circuit and courts in this district have repeatedly upheld such restrictions in cases like these, where there is a

---

[2] The SAMs also allow Tsarnaev to communicate and visit with representatives of U.S. courts, federal judges, U.S. Attorney's Offices, members of the U.S. Congress, the Bureau of Prisons, and federal law enforcement entities. Ex. A ¶¶ 3.g. He is permitted to communicate with other inmates during predesignated times. *Id.* ¶ 1.c. He may access mass communications, including television, newspapers, books, and other publications. *Id.* ¶¶ 8-9.

[3] The Court has dismissed Claims 5 and 6. *See* ECF No. 15.

rational relationship between the restrictions and the inmate's offense—bolstered here by Tsarnaev's expressed commitment to violent jihad and his stated belief that Islam allows the killing of the innocents he murdered. Claim 3, which asserts that Tsarnaev cannot correspond or speak by telephone with his nieces and nephews, also has been rendered partially moot by the elimination of some of those restrictions. And the Eighth Amendment aspect of Claim 3 fails because Tsarnaev has not alleged that he is deprived of a basic human need.

In Claims 4 and 7, Tsarnaev asserts that the SAMs violate his right to procedural due process, but the Tenth Circuit has made clear that Tsarnaev has no liberty interest in avoiding SAMs. Regardless, the processes available to Tsarnaev satisfy constitutional standards.[4]

## ARGUMENT

I.   **The SAMs are reasonably related to preventing violence and terrorism and therefore do not violate the First Amendment (Claims 1-3, TAC pp. 4, 10-16).**

These claims contend that three provisions in the SAMs violate the First Amendment: (1) the rule prohibiting Tsarnaev from sending photographs of himself to people outside the prison (Claim 1); (2) the rule prohibiting him from sending items he has crafted to people outside the prison (Claim 2); and (3) the rule defining the manner in which he can communicate with his nieces and nephews (Claim 3).[5] Although not a specifically-pled claim, Tsarnaev further suggests that the SAMs, as a whole, violate the First Amendment. TAC p. 27(i) (seeking permanent injunction ordering removal and prohibiting reimposition of SAMs). No claim should proceed.

### A.   Legal standards.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held that "when a prison

---

[4] Defendants will soon file a motion for partial summary judgment on the unexhausted claims.
[5] Claim 3 also includes an Eighth Amendment component, which is addressed below.

regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This deferential standard reflects the principle that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948), *overruled on other grounds*, *McCleskey v. Zant*, 499 U.S. 467 (1991). The Supreme Court has repeatedly held that First Amendment rights are appropriately curtailed in prison, and that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).

The *Turner* test is satisfied if the officials, in their judgment, believe that a restriction would advance the desired goal. *See Johnson v. California*, 543 U.S. 499, 513 (2005) (*Turner* does not require proof that policy advances the stated goal, but only that officials "might reasonably have thought" the policy would advance the goal); *Beard v. Banks*, 548 U.S. 521, 535 (2006) (upholding restriction even absent showing that it had "proven effective"). In conducting this analysis, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Id.*

To survive a motion to dismiss, it is Tsarnaev's burden to account for the "core holding" of *Turner* by alleging facts showing "that there is no legitimate, rational basis" for the restrictions. *Al-Owhali v. Holder*, 687 F.3d 1236, 1240-41 (10th Cir. 2012) (upholding dismissal of First Amendment claims brought by SAMs inmate). "Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison." *Gee*, 627 F.3d

at 1185. Tsarnaev must allege specific facts showing that the anticipated, "usual justifications" do not have a rational connection to the challenged restrictions—facts "that might well be unnecessary in other contexts to surmount a motion to dismiss." *Al-Owhali*, 687 F.3d at 1240.

Preventing acts of violence, inside or outside the prison, is beyond doubt a legitimate penological interest. *Turner*, 482 U.S. at 91 (prison has legitimate penological interest in restricting communications that could "be used to communicate escape plans and to arrange assaults and other violent acts"); *see also*, *e.g.*, *Davis v. Fed. Bureau of Prisons*, No. 15-cv-0884-WJM-MJW, 2016 WL 1156755, at *4 (D. Colo. Mar. 24, 2016) ("averting criminal activity and protecting security and order" are legitimate penological interests). The government also has a "uniquely federal penological interest in addressing national security risks." *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012). While prison administrators are entitled to substantial deference, *Overton*, 539 U.S at 132, that deference is even greater in the realm of national security, where "conclusions must often be based on informed judgment rather than concrete evidence[.]" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010). That predictive judgment receives deference because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment." *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988).

Based on these legitimate interests, the Tenth Circuit and courts in this district have repeatedly upheld SAMs restrictions. *Al-Owhali*, 687 F.3d at 1241; *Gowadia v. Stearns*, 596 F. App'x 667 (10th Cir. 2014); *Abdulmutallab v. Barr*, No. 17-cv-02493-RM-KMT, 2019 WL 4463284 (D. Colo. Sept. 18, 2019); *Nicholson v. Brennan*, No. 15-cv-01999-KLM, 2017 WL 4337896 (D. Colo. Sept. 28, 2017); *Salim v. Sessions*, No. 13-cv-03175-RM-CBS, 2017 WL 11487131 (D. Colo. May 2, 2017). The well-pleaded facts compel the same conclusion here.

**B.      Tsarnaev has not alleged that any SAMs restriction lacks a rational basis.**

As in the cases in which the Tenth Circuit and this Court have upheld SAMs restrictions,

there is "an obvious and reasonable relationship between [Tsarnaev's] crimes and the measures the BOP implemented to restrict his communications." *See Gowadia*, 596 F. App'x at 673. In Tsarnaev's case, the Attorney General determined that, because of Tsarnaev's proclivity for violence, there is a substantial risk that his communications or contacts could result in death or serious bodily injury to others. Ex. A at 1-2.

The Attorney General detailed the extraordinary violence and destruction for which Tsarnaev is responsible, including killing, dismembering, and seriously injuring scores of spectators at the Boston Marathon; killing one police officer and attempting to kill others; and carjacking an unsuspecting civilian to attempt to evade capture. *Id.* at 2. Tsarnaev's murderous conduct led to his being convicted on 30 counts, including multiple charges involving weapons of mass destruction. Ex. D, Judgment, *United States v. Tsarnaev*, No. 13CR10200 (D. Mass.), at 2-4.

The Attorney General pointed to Tsarnaev's motivational power over others, prompting them to commit crimes and face federal prosecution to protect him in the aftermath bombing. Ex. A at 3. As the Attorney General observed, Tsarnaev's influence over others who may harbor dangerous intentions continues: six years after Tsarnaev decided to "punish" innocent Americans for the supposed "evil" of their government, *id.* at 2, he continues to receive mail from fans who are enamored with him and want to receive letters from him. *Id.* at 3. For his part, Tsarnaev has attempted to flout the SAMs by reaching out to people who are not approved contacts. *Id.* Coupled with Tsarnaev's demonstrated dangers is information showing that Tsarnaev's personal commitment to violent jihad did not end at the Boston Marathon. He told the FBI he hoped to inspire others to similar acts; he wrote "the jihad continues" on the wall of his prison cell; and he was caught at the ADX with a concealed weapon he made from a razor. *Id.*

Tsarnaev's allegations are wholly insufficient to allege that the SAMs, or any provision in the SAMs, are not reasonably related to the penological interests of preventing acts of violence and

terrorism and protecting national security.

### 1. The SAMs as a whole are rationally related to penological interests.

Nowhere in Tsarnaev's complaint does he show, based on well-pleaded facts, that government officials lack any legitimate, rational basis for the decision to circumscribe and monitor his communications by means of SAMs. He does not even attempt to plead facts plausibly suggesting that he would not engage in violence or that he would refrain from trying to harm national security; rather, his complaint rests on conclusory allegations about how the SAMs allegedly violate his rights and injure him. *See generally* TAC pp. 11-16.

But even if Tsarnaev had alleged that he has renounced violent jihad against the United States, which he does not do, the officials charged with protecting the security of the United States and its people would not be obliged to believe him. *Turner* does not focus on whether the challenged restrictions are actually necessary, but on whether Defendants might rationally believe they advance the stated security interests. *Johnson*, 543 U.S. at 513; *see also Sperry v. Werholtz*, 413 F. App'x 31, 40 (10th Cir. 2011) (finding irrelevant whether prison policy advanced the stated interests because "[t]he only question" is whether the judgment "was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests").

Because the officials involved in assessing Tsarnaev's dangers cannot know with certainty his true beliefs, they must exercise predictive judgment, which receives substantial deference and must be upheld if there is any rational basis for the restrictions. *Overton*, 539 U.S. at 132; *Humanitarian Law*, 561 U.S. at 34-35. Here, the rational basis is evident. Tsarnaev's allegations cast no doubt on the fact that Defendants might reasonably believe the SAMs advance critical security interests in light of his heinous crimes (and his self-justification for those crimes), his

influence over fans outside the prison, his unretracted and unrepentant commitment to violent jihad against the United States, and the other facts detailed above.

In sum, Tsarnaev fails to allege that the SAMs, taken as a whole, lack a rational basis. Any claim seeking removal of the SAMs or forbidding their reimposition, *see* TAC p. 27, fails.

### 2. Specific SAMs provisions are rationally related to penological interests.

So too are Tsarnaev's allegations insufficient to show that any of the three SAMs restrictions he specifically targets do not relate to and reasonably further legitimate penological interests in preventing violence and protecting national security.

#### a. Claim 1: Tsarnaev has not alleged that it is irrational to prohibit the dissemination of his photograph outside the prison.

The SAMs prohibit Tsarnaev from mailing his photograph outside the prison, either by legal or non-legal mail. Ex. A ¶¶ 2.i., 3.g. He claims this rule has resulted in the "destruction of [his] familial relationships" and caused him emotional distress. TAC ¶ 13. The claim fails.

Tsarnaev does not attempt to rebut in his pleading the obvious justification for not allowing him to send his photograph to anyone, including his approved contacts: the potential for his visage to reach an established fan base that very likely includes people who share his hatred of the United States and his commitment to violent jihad. *See Al-Owhali*, 687 F.3d at 1240-41 (inmate did "not rebut in his pleadings" the "coherent explanation" for the SAMs or allege specific facts showing why the "usual justifications did not apply). It is reasonable for officials with expertise in the international and domestic terrorism arenas to conclude that widespread circulation of a current photograph of the Boston Marathon bomber[6] risks inspiring new acts of violence and terrorism.

---

[6] Tsarnaev's controversial photograph in *Rolling Stone* is known to have attracted widespread attention. A Google search of "Tsarnaev" and "*Rolling Stone*" yields over 123,000 results. *See* https://www.google.com/search?q=tsarnaev+rolling+stone.

And those risks are by no means eliminated even if the photos are sent only to members of his family, who may share them with others, as past history suggests. *See* Ex. A at 3 (Tsarnaev's mother in Russia sent recording of his voice to media). National-security officials can reasonably conclude that the risk is too great that Tsarnaev's contacts might do the same with his photographs.

Tsarnaev alleges no facts demonstrating that these predictive judgments lack a rational basis. The fact that older versions of his SAMs did not prohibit him from mailing photographs, *see* TAC ¶ 10, has no bearing on the matter. National-security officials do not work in a static environment; their assessment of dangers can change over time, and that assessment is entitled to deference. *Humanitarian Law*, 561 U.S. at 33-34 (officials must "confront evolving threats"). Tsarnaev has not alleged that these officials lacked a rational basis for adopting a rule that prevents his picture from reaching media outlets and social media platforms throughout the world.

Tsarnaev's allegation that the photograph restriction is based on "false[] characteriz[ations]" and "lie[s]," *see* TAC ¶¶ 6-7, 9, 15, does not support a plausible claim. Even if government officials misapprehended the situation (or simply took a different view of the matter than Tsarnaev), they do not act without a rational basis when they adopt a rule they believe will advance the stated interests. *See Johnson*, 543 U.S. at 513. Here, the well-pleaded facts show that officials "might reasonably have thought" that keeping the photograph of "an unrepentant and committed terrorist, " Ex. A at 4, out of the public eye will diminish the risk of his influence triggering additional acts of violence and terrorism. And the fact that "other high security inmates placed under SAMs" may not be subject to this restriction, TAC ¶ 14, shows no lack of rationality in the rule. When it comes to pictures of Tsarnaev and their potential impact on his fans, he is sui generis. National-security officials act rationally when they adopt a rule taking that into account.

Finally, Tsarnaev's invocation of an erroneous legal standard does not salvage his claim. He alleges that, because the claim focuses on "outgoing" correspondence, it is evaluated pursuant

to the less-deferential standard set forth in *Procunier v. Martinez*, i.e., whether the restriction "furthers one or more of the substantial governmental interests of security, order, and rehabilitation," and is "no greater than is necessary or essential to the protection of the particular governmental interest involved." *See* 416 U.S. 396, 414 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989); *see also* TAC ¶¶ 11-12.[7] Not so.

For challenges to SAMs, the Tenth Circuit has held that the *Turner* rational basis test applies to inmate correspondence, whether outgoing or incoming. *See Al-Owhali*, 687 F.3d at 1241 (making no distinction between incoming and outgoing mail in finding that SAMs restrictions are analyzed pursuant to *Turner*); *see also*, *e.g.*, *Gee*, 627 F.3d at 1187-88 (evaluating plausibility of inmate's First Amendment claim based on "his right to communicate with persons outside the prison" under *Turner*); *Beerheide v. Suthers*, 286 F.3d 1179, 1184 (10th Cir. 2002) (recognizing that *Turner* "constituted a corrective to decisions [including *Martinez*] that granted prison officials next to no deference in how they accommodated the rights of prisoners"). Nor does it makes sense that *less* deference should be given to security judgments designed to prevent Tsarnaev from inciting violence outside the prison by means of outgoing communications. Letters sent by a confirmed terrorist like Tsarnaev—which could reach a pliant fan base and fellow adherents of violent jihad—pose even more risks than correspondence sent to him. *Cf. Thornburgh*, 490 U.S. at 413 ("The implications of outgoing correspondence for *prison security* are of a categorically lesser magnitude than the implications of incoming materials[.]") (emphasis added).

Here, in contrast with *Thornburgh*, *national* security is the key concern, and the

---

[7] Tsarnaev invokes this incorrect standard in connection with his other First Amendment claims, TAC ¶¶ 29-30, 40-41, but *Turner* guides the Court's analysis of each First Amendment claim.

implications of Tsarnaev's outgoing correspondence for national security are *not* of "a categorically lesser magnitude" than those of incoming correspondence. Like the Tenth Circuit, this Court should refuse to import the *Martinez* standard into the national-security arena, where the risks of any mistake in monitoring of outgoing correspondence could be deadly. Regardless, the rule Tsarnaev challenges passes muster under *Martinez*, even if it applied, because it plainly furthers the government's interest in protecting security and is "generally necessary" to that legitimate governmental interest. *See Thornburgh*, 490 U.S. at 411 (rejecting reading of *Martinez* "as subjecting the decisions of prison officials to a strict 'least restrictive means' test").

Claim 1 is doomed by Tsarnaev's failure to allege that national-security officials lack any rational justification to prohibit him from sending his photograph outside the prison.

> **b.** **Claim 2: Tsarnaev has not alleged that it is irrational to prohibit items handmade by him from reaching the public.**

In Claim 2, Tsarnaev challenges the SAMs rule prohibiting him from sending his handmade hobby crafts to people outside the prison. *See* Ex. A ¶¶ 2.i., 3.g.; *see also* TAC ¶ 18 (noting that SAMs were modified in August 2019 to include this provision).[8] He asserts that this restriction interferes with the "relationship between [him] and [his] capital counsel" and interferes "with the ongoing development of mitigating evidence" in his capital case. TAC ¶¶ 27-28. He argues that gifting his handiwork "is well established mitigation under *Skipper v. California*, [476 U.S. 1 (1986)]." *Id.* ¶ 24. The claim fails.

Tsarnaev has no constitutional right to participate in a prison hobby craft program. *See, e.g.*, *Estate of DiMarco v. Wyo. Dep't of Corrs.*, 473 F.3d 1334, 1343 (10th Cir. 2007) (inmate does not have a right every type of program available to other inmates, including work and

---

[8] For completeness, a copy of Tsarnaev's 2019 SAMs is attached at Exhibit C.

recreation programs); *Templeman v. Gunter*, 16 F.3d 367, 370 (10th Cir. 1994) (inmates have no constitutional right to employment); *Standifer v. Ledezma*, 653 F.3d 1276, 1280 (10th Cir. 2011) (no constitutional right to participate in a residential drug abuse program); *Joseph v. U.S. Fed. Bureau of Prisons*, 232 F.3d 901, 2000 WL 1532783, at *2 (10th Cir. 2000) ("prisoners have no constitutional right to educational or vocational opportunities during incarceration").

Regardless, as with the photograph claim, Tsarnaev has not attempted to rebut in his pleading the obvious justifications for not allowing him to circulate items handmade by him to anyone outside the prison: (1) the risk that these items will fall into the hands of aspiring jihadists, inspiring them to execute their own acts of terror, and (2) the risk that those jihadists, or others in his fan base, will promote Tsarnaev's violent agenda by selling or donning his wares. Tsarnaev may disagree with this assessment, but deference is due to the judgment of national-security officials who daily seek to prevent terrorist attacks like the one Tsarnaev successfully executed. His allegations about the purported connection between his handicrafts and "mitigation" are insufficient to show that the officials acted irrationally in evaluating the risks associated with possessing items handmade by the Boston Marathon bomber.

Tsarnaev is also incorrect about the law. *Skipper* concerned the erroneous exclusion of testimony from prison officials who would have described a death-sentenced inmate's good behavior in prison—testimony that addressed the "defendant's disposition to make a well-behaved and peaceful adjustment to life in prison[,] … an aspect of his character that is by its nature relevant to the sentencing determination." *See* 476 U.S. at 7. *Skipper* did not address an inmate's "relationship" with his attorneys, who could never testify about his mitigation efforts in any event. Neither did it suggest that an inmate must be allowed to engage in behaviors judged to be

dangerous by national-security officials in the name of perceived "mitigation." *See* 476 U.S. 7 n.2 (emphasizing that not "all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating").

But even if the mitigation point had minimal relevance, it is far outweighed by the risks associated with handmade items from the Boston Marathon bomber being circulated among his jihadist allies—a rational conclusion well within the expertise and discretion of national-security officials to make. The facts also show that Tsarnaev strongly *wants* to reach persons outside the scope of his approved contacts by means of his handiwork. As explained in his current SAMs, "[b]etween October 2018 and August 2019, [Tsarnaev] made several attempts to circumvent the SAM by sending hobby craft (specifically, crocheted scarves and blankets) to *unapproved* contacts." Ex. A at 3 (emphasis added). Indeed, Tsarnaev has used other inmates to help him sneak his handiwork outside the ADX, circumventing the SAMs by "covertly providing [his] hobby craft to another SAM inmate, who in turn attempted to unsuccessfully [] mail the items out." Ex. C at 3.

It is reasonable for national-security officials to be concerned about Tsarnaev's crafts slipping into the hands of persons who wish to harm the United States, and the effect on them of possessing an item "handmade by Dzhokhar." Tsarnaev fails to allege the absence of a rational justification for the restriction on his mailing his handmade wares outside the prison.

        c.      <u>Claim 3</u>: **Tsarnaev has not alleged that it is irrational to limit the means by which he communicates with young children or that the rules deprive him of a constitutionally-recognized need.**

The SAMs imposed in August 2020 allowed Tsarnaev to visit in person with his nine nieces and nephews, provided they are "accompanied by an approved immediate family contact." *See* Ex. A ¶ 3.f.i. In addition to those in-person visits, the SAMs implemented in August 2021 allow Tsarnaev to exchange written correspondence with the six nieces and nephews who reside

with one of his sisters, who are themselves approved contacts under the SAMs. Ex. A ¶ 3.g. Tsarnaev, however, wants correspondence and telephone privileges with all nine nieces and nephews. TAC ¶ 32. He claims the rules violate the First and Eighth Amendments. *Id.* ¶¶ 36, 38.[9]

   ***First Amendment claim: There is a rational basis for imposing limits on communications between a convicted terrorist and young children.*** Tsarnaev can communicate with every one of his nine nieces and nephews in at least one form (in-person visits), and for six of them, two forms (visits and written correspondence). Tsarnaev has not rebutted the rational justifications for these rules. *See Al-Owhali*, 687 F.3d at 1241.

   Telephone calls, of course, occur in real-time, and dangerous communications can quickly be transmitted before monitors can break the call. Children, it goes without saying, are highly vulnerable to influence and may be particularly susceptible to proclamations from their uncle. The government has a legitimate interest in preventing Tsarnaev from attempting to inculcate a desire to harm the United States in these vulnerable young children. National-security officials have experience showing that violence and terrorism can become a family affair. *See Nicholson*, 2017 WL 4337896, at *5 (imprisoned spy persuaded son to carry clandestine messages to Russian agents). Furthermore, national-security officials can rationally conclude that the risks of successfully passing dangerous communications are higher by telephone than during in-person visits, where both Tsarnaev and his family—who will have traveled hundreds, if not thousands, of miles to visit him—may be less inclined to risk termination of the visit by breaking the rules. Tsarnaev's pleading rebuts none of these rational explanations for the ban on telephone contact with young children.

---

[9] The claims are also partially moot because the operative SAMs allow written correspondence with six nieces and nephews. *See, e.g.*, *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015) (claim moot where litigant "no longer suffers 'actual injury that can be redressed by a favorable judicial decision'"). The Court should not assess the moot aspects of the claims.

As for correspondence privileges, the six children who are permitted to exchange letters with their uncle, *see* Ex. A ¶ 3.g., live with Tsarnaev's sisters. Tsarnaev has not alleged, and could not show, that the three children not afforded writing privileges reside with approved contacts. National-security officials can reasonably decide that allowing written correspondence from Tsarnaev to be sent to a household in which unapproved contacts reside will readily make its way into the hands of those unapproved persons, thus undermining the government's security decision not to approve those contacts in the first place.

Tsarnaev's First Amendment claim fails because his pleading does not address these coherent security rationales for the restrictions.

***Eighth Amendment claim*: Tsarnaev has not alleged that limiting communications between a convicted terrorist and young children amounts to cruel and unusual punishment.**
Tsarnaev falls far short of meeting the standards for pleading an Eighth Amendment conditions-of-confinement claim, which requires that he allege an "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1987). The Supreme Court has recognized that qualifying needs include such things as "food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *see also Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) (listing "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities" as qualifying needs).

Tsarnaev's pleading does not come close to meeting these standards. He does not allege an unquestioned and serious deprivation of a basic human need, such as food, warmth, or exercise. Neither has he alleged that he has been deprived of all association, just very specific forms of contact with a limited group of people—each of whom he *can* communicate with in some form, if not the one he prefers. The fact that he feels "psychological and emotional distress" because he would like to talk with (and possibly influence) young members of his extended family, TAC ¶ 38,

demonstrates no viable claim. "The plaintiff's *reactions to* his conditions of confinement, without more, cannot serve to measure … whether he has been deprived of the minimal civilized measure of life's necessities." *Al-Owhali*, 2010 WL 5651033, at *11 (emphasis in original).

Tsarnaev's claim is like those raised in the many cases, from both the Tenth Circuit and this Court, holding that conditions at ADX—including conditions for inmates who have SAMs— do not violate the Eighth Amendment. *Gowadia*, 596 F. App'x at 674; *Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003); *Ajaj v. United States*, 293 F. App'x 575, 582–84 (10th Cir. 2008); *Davis*, 2016 WL 1156755, at *6 (D. Colo. Mar. 24, 2016); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1250-51 (D. Colo. 2011). He has not alleged a deprivation of constitutional magnitude.

## II.     Tsarnaev has failed to allege a due-process violation (Claims 4, 7).

Tsarnaev brings two procedural-due-process claims: one challenging the imposition of the SAMs, TAC ¶¶ 46-54 (Claim 4), and the other challenging decisions concerning his admittance to a less-restrictive level, or "phase," of the SAMs program. *Id.* ¶¶ 76-97 (Claim 7). To state a due-process claim, Tsarnaev must allege facts showing (1) that he was deprived of a protected liberty or property interest, and, if so, (2) that the procedures followed were constitutionally insufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Tsarnaev's pleading falls far short, on both prongs. The Tenth Circuit and this Court have considered these claims and repeatedly rejected them.

### A.     <u>Claim 4</u>: The SAMs do not create a protected liberty interest, but even so, Tsarnaev receives sufficient process to address the claimed deprivation.

***Tsarnaev fails to allege a liberty interest.*** The Tenth Circuit has made clear that avoiding SAMs does not fall within the narrow range of constitutionally protected liberty interests retained by an inmate like Tsarnaev. *Gowadia*, 596 F. App'x at 673-74. Here, as in *Gowadia*, the relevant factors strongly weigh against finding a liberty interest.

As to the first factor—whether the treatment relates to and furthers legitimate penological

interests—there is a "reasonable relationship" between Tsarnaev's SAMs and the government's interests in preventing acts of violence and protecting national security for the reasons explained earlier. *Gowadia*, 596 F. App'x at 673. Tsarnaev does not even attempt to rebut these voluminous reasons for the SAMs, nor could he.[10] Because Tsarnaev has wholly failed to allege the absence of a rational basis for the SAMs, this factor strongly weighs against finding a liberty interest.

The second factor—whether the challenged conditions are extreme—also weighs against a liberty interest because, as the Tenth Circuit confirmed, SAMs measures "do not, standing alone, amount to extreme conditions." *Gowadia*, 596 F. App'x at 673. After all, Tsarnaev is allowed to communicate with other people (both inside and outside the prison, including members of his extended family), read books and other publications, and obtain information from the mass media. A comparison of Tsarnaev's SAMs with "the type of nonpunitive confinement routinely imposed on inmates serving comparable sentences," *Rezaq*, 677 F.3d at 1014, further emphasizes that the SAMs are not extreme. Any BOP inmate can be subject to limits on his contacts outside the prison.[11] Here, as in *Gowadia*, this factor weighs against finding a liberty interest.

The third factor also does not weigh in Tsarnaev's favor because the SAMs do not increase the duration of his confinement. *Gowadia*, 596 F. App'x at 673; *Rezaq*, 677 F.3d at 1015-16.

The fourth and final factor—whether the SAMs are "indeterminate," *Gowadia*, 596 F. App'x at 673—also weighs against finding a liberty interest. The Tenth Circuit has emphasized that periodic reviews mean that a condition is *not* indeterminate. *See id.* at 673-74 (observing that

---

[10] Instead, Tsarnaev focuses on an irrelevant statement in his August 2020 SAMs concerning tampering with a Covid mask. This reference does not appear in his current SAMs, nor is it relevant to whether the SAMs rationally advance legitimate penological interests.

[11] *See, e.g.*, 28 C.F.R. §§ 540.15(d)(1), (3) (Restricted General Correspondence Status limits correspondence to members of inmates' immediate families and former business associates); *id.* at § 540.18(c)(2)(iii) (restrictions may be imposed on "special mail"); *id.* at §§ 540.100(a), 540.102 (authorizing limits on telephone privileges and allowing monitoring of inmate calls).

Gowadia did not "allege that he has not received the same periodic reviews and procedural protections that we found sufficient in *Rezaq*," and that "the SAMs expire after one year if not modified before then"). This Court can take judicial notice of the fact that Tsarnaev receives multiple reviews, further described below,[12] including a review by Department of Justice officials to assess whether or not the SAMs should continue to be imposed. *See* Ex. E, FLM 5321.08(3), *Special Security Unit* (H-Unit) (Nov. 10, 2020), at p. 2, § 3.B.; *see also Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010) (BOP policies subject to judicial notice). Those procedures include an opportunity for Tsarnaev to provide written comments and to meet with FBI officials in person. Tsarnaev has not alleged that he does not receive these reviews.[13]

In sum, "none of the four *Rezaq* factors weigh in favor of finding that [Tsarnaev] had a constitutionally protected liberty interest in avoiding either the SAMs or confinement at ADX." *Gowadia*, 596 F. App'x at 673. Neither has this Court ever found that SAMs implicate a liberty interest. *Ayyad v. Holder*, No. 05-cv-02653-WYD-MJW, 2014 WL 4747451, at *36 (D. Colo. Sept. 24, 2014); *Gowadia v. Stearns*, No. 13-cv-00077-KMT, 2014 WL 959487, at *10 (D. Colo. Mar. 12, 2014), *aff'd*, 596 F. App'x 667 (2014); *Yousef v. United States*, No. 12-cv-2585-RPM, 2014 WL 1908711, at *5 (D. Colo. May 13, 2014); *Allmon v. Wiley*, No. 08-cv-01183-MSK-CBS, 2011 WL 4501941, at *15 (D. Colo. Aug. 25, 2011), *adopted*, 2011 WL 4501937 (D. Colo. Sept. 27, 2011), *aff'd*, 483 F. App'x 430 (10th Cir. 2012). This Court likewise should dismiss Claim 4.

**_Tsarnaev has not alleged that he lacks constitutionally sufficient process._** Given that Tsarnaev has failed to allege that the SAMs implicate a liberty interest, the Court's analysis should

---

[12] The fourth factor does not require an exhaustive analysis of the review procedures. *Rezaq*, 677 F.3d at 1016 ("it is not necessary for us to closely review the process at this stage").

[13] As will be explained in the motion for partial summary judgment, for each of the past three SAMs renewals, Tsarnaev has chosen not to avail himself of the available procedures.

end here. Regardless, the facts do not plausibly show that Tsarnaev receives insufficient procedural protections in this context, where minimal process is required.

The Supreme Court has held that "a relaxed set of procedures satisfied an inmate's challenge to a placement decision or conditions of confinement." *DiMarco*, 473 F.3d at 1344 These relaxed procedures can be "informal" and "nonadversary" where, as here, the decision draws on the expertise of prison administrators. *Wilkinson v. Austin*, 545 U.S. 209, 228-29 (2005) (citing *Hewitt v. Helms*, 459 U.S. 460 (1983), and *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979)). Here, additional deference to government officials is required because their decision is based on the predictive judgment that Tsarnaev's communications could trigger violence and jeopardize national security. *Humanitarian Law*, 561 U.S. at 34-35.

The Tenth Circuit has confirmed that relaxed procedures satisfy due process if they provide: "(1) a sufficient initial level of process, i.e., a reasoned examination of the assignment; (2) the opportunity for the inmate to receive notice and respond to the decision; and (3) safety and security concerns to be weighed as part of the placement decision." *DiMarco*, 473 F.3d at 1344. Tsarnaev has not alleged facts showing the process that is provided to him is inadequate.

As to the first factor, the facts show there was a reasoned examination of the need for the SAMs. That review was conducted by Department of Justice officials who are in a position to make informed judgments about Tsarnaev's potential dangers. *See* Ex. A at 1-4.

In accordance with the second factor, Tsarnaev received notice and an opportunity to respond to the SAMs decision. The notice provided in the SAMs, *see id.*, satisfies due process. *See Hewitt*, 459 U.S. at 476 (where inmate represents a security threat, he "must merely receive *some*

notice") (emphasis added).[14] Tsarnaev can use that notice to respond to the government's expressed concerns, both in administrative remedies challenging the SAMs and during the pre-renewal evaluation process where he can be heard, both in writing and in person. *See* Ex. E, ¶ 3.B. (describing SAMs evaluation procedures); 28 C.F.R. § 501.2(d) (authorizing inmate to seek review of SAMs through BOP's administrative remedy program). And Tsarnaev receives additional process outside of the formal SAMs review procedures. He can object to the SAMs and give input during other BOP reviews, including his twice-yearly Program Reviews, his classification review and his progress reports. *See* PS 5322.13, *Inmate Classification and Program Review* (July 24, 2006), available at https://www.bop.gov/policy/progstat/5322_013.pdf; PS 5803.08; *Progress Reports* (Feb. 27, 2014), available at https://www.bop.gov/policy/progstat/5803_008.pdf. These procedures are more than sufficient, where only "some sort of periodic review" is required. *See Hewitt*, 459 U.S. at 477 n.9.

As for the third factor, the review by Department of Justice officials demonstrates that they carefully evaluate the specifics of Tsarnaev's situation and weigh "safety and security concerns" in deciding whether SAMs were warranted. Ex. A at pp. 1-4; *DiMarco*, 473 F.3d at 1344.

In sum, the multiple, multi-level review processes available to Tsarnaev provide sufficient procedural safeguards, even if a liberty interest were implicated. Claim 4 fails.

**B.    Claim 7: The decision not to advance Tsarnaev to another phase of the SAMs program implicates no liberty interest.**

Tsarnaev also complains that he has been denied admittance to the second phase of the SAMs program, despite allegedly meeting all requirements. TAC ¶ 83; *see also* Ex. E ¶ 4, pp. 5-10 (describing three-phased Special Security Unit Program, in which "[e]ligibility for consideration

---

[14] The SAMs regulation provides that the inmate receives "notification of the restrictions imposed and the basis for these restrictions." 28 C.F.R. § 501.2(b).

does not equate to appropriateness for advancement to the next phase"). The grounds for dismissing Claim 4, discussed above, also support dismissal of this related due-process claim.

Because Tsarnaev has no "constitutionally protected liberty interest in avoiding either the SAMs or confinement at ADX," *Gowadia*, 596 F. App'x at 673, he necessarily has no liberty interest in participating in a program that lessens restrictions that do not themselves pose an atypical and significant hardship on him. *See Silverstein v. Fed. Bureau of Prisons*, 704 F. Supp. 2d 1077, 1097 (D. Colo. 2010 (concluding that "ability to enter the Step-Down Unit Program runs hand-in-hand with any liberty interest [an ADX inmate] has in his conditions of confinement," and "if his conditions of confinement fail to rise to the level of a liberty interest, there would be no process due under the Fifth Amendment either in initially subjecting him to those conditions or perpetuating them … by excluding him from the Step-Down Unit Program"), *aff'd*, 559 F. App'x 739 (10th Cir. 2014).[15] Claim 7 cannot proceed.

## CONCLUSION

All remaining claims in the Third Amended Complaint, ECF No. 11, should be dismissed.

Respectfully submitted October 15, 2021.    MATTHEW T. KIRSCH
Acting United States Attorney

*s/ Susan Prose*
Susan Prose, Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Tel: (303) 454-0100
Email: susan.prose@usdoj.gov

---

[15] *See also Muhammad v. Hood*, 100 F. App'x 782, 783 (10th Cir. 2004) (removing inmate from step-down program to more restrictive unit created no liberty interest); *Allmon*, 2011 WL 4501941, at *15 ("neither an inability to participate in the Special Security Unit Program nor ineligibility for the Step-Down Program for ADX general population inmates shows that the conditions in H Unit deprived him of a protected liberty interest"); *Bradshaw v. Lappin*, 738 F. Supp. 2d 1143, 1155 (D. Colo. 2010) (no liberty interest in loss of access to ADX step-down program), *aff'd*, 484 F. App'x 217 (10th Cir. 2012).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on October 15, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

A. Powell
Senior Attorney Advisor
Federal Bureau of Prisons

I further certify that, pursuant to the Court's directive issued on October 13, 2021, I will email the foregoing, with copies of the unpublished cases cited therein, to BOP personnel for hand-delivery to Mr. Tsarnaev at ADX.

*s/ Susan Prose*
Susan Prose
United States Attorney's Office