Civil Action No. 21-cv-00010-MEH

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

NOV 22 2021

JEFFREY P. COLWELL
CLERK

Dzhokhar Tsarnaev,

   Plaintiff,

v.

Merrick Garland, Attorney General of the United States,
Federal Bureau of Prisons,
B. True, Warden, ADMAX, and
John Does 1-20,

      Defendants.


Plaintiff's response to Defendants' motion to Dismiss.

## Legal Standard

It appears that Defendants move to dismiss Claims 1-3

for failure to state a claim under Fed. R. Civ. P. 12(b)(6). In

adjudicating a Rule 12(b)(6) motion for dismissal, a district court

must "accept all the well-pleaded allegations of the complaint as

true and must construe them in the light most favorable to the

plaintiff." Alvarado v. KOB-TV, L.L.C., 493 F. 3d 1210, 1215 (10th Cir. 2007)

(quoting David v. City and Cty. of Denver, 101 F.3d 1344, 1352 (10th Cir. 1996)).

"Courts should look to the specific allegations in the complaint to

determine whether they plausibly support a legal claim for relief."

Alvarado, 493 F.3d at 1224, see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"). Courts do not examine "whether a claim is improbable" but instead whether the complaint's factual allegations "raise a right to relief above the speculative level." Kay v. Bemis (10th Cir. 2007) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 555 (2007)).

## Argument

1. Defendants' reliance on materials outside Plaintiff's well-pleaded allegations is erroneous at this stage, and the Court should decline Defendants' invitation to take judicial notice of the Exhibits.

The Court may take judicial notice of facts regarding my criminal background but the Defendants' purported facts are easily disputed. For example:

• I am not a devotee of al-Qaeda nor was I ever a devotee of al-Qaeda. Defendants do not provide any evidence to support the claim that I am a "confirmed devotee" of

al-Qaeda. I have never expressed support for the group

and I certainly do not advocate violence or terrorism.

• During my supervised visit with my dear sister, I explained

to her that the government is subjecting me to the SAM

falsely believing that I would do something stupid like

tell someone to "buy a pressure cooker." Certainly, I

would never encourage an act of violence or tell my

sister, in front of a sitting FBI agent, that I would

encourage somebody to buy a pressure cooker.

• While struggling to maintain my sanity, I added a personal

touch to a wall that was already littered with a variety of

~~thought~~ philosophical thought by writing "the jihad continues."

Linguistically speaking, "jihad" is an Islamic term that applies

to a broad spectrum of activities, ranging from daily striving

to meet the day's challenges, to the striving against one's

desires and self. Therefore, jihad is not limited to war

and my use of the word, in this instance, is not in reference

to war or violence. SAMs are synonymous with solitary

confinement, so understanding how solitary confinement affects

a person's mental and physical condition is crucial to fully

appreciating the struggle I am refering to.

As the Court of Appeals for the Third Circuit recently observed:

A comprehensive meta-analysis of the existing literature on
solitary confinement within and beyond the criminal justice setting
found that "the empirical record compels an unmistakable conclusion:
this experience is psychologically painful, can be traumatic and
harmful, and puts many of those who have been subjected to it
at risk of long-term... damage." Specifically, based on an
examination of a representative sample of sensory deprivation
studies, the researchers found that virtually everyone exposed
to such conditions is affected in some way. They further
explained that "there is not a single study of solitary confinement
wherein non-voluntary confinement that lasted for longer than
10 days failed to result in negative psychological effects." And
as another researcher elaborated, "all individuals subjected to
solitary confinement will... experience a degree of stupor, difficulties
with thinking and concentration, obsessional thinking, agitation,
irritability, and difficulty tolerating external stimuli."
Anxiety and panic are common side effects. Depression, post-
traumatic stress disorder, psychosis, hallucinations, paranoia,
claustrophobia, and suicidal ideation are also frequent results.
Additional studies included in the aforementioned meta-analysis
further "underscored the importance of social contact for the
creation and maintenance of 'self.'" In other words, in the
absence of interaction with others, an individual's very identity
is at risk of disintegration.

In my case, my long-term placement in solitary has been

hazardous to my mental and physical health. And given that SAMs create isolation even more extreme than that of standard solitary confinement, the substantial risks of permanent harm are only heightened.

• In 2018, I was issued an incident report for possessing a "hazardous tool." The matter was settled by a Discipline Hearing Officer to whom I admitted that I got too carried away in the culinary arts. It was not determined that I meant to harm anyone.

• In June 13, 2013, my mother shared with the media her recorded phone conversation with me but of course, the SAM was not implemented until August 2013, so there were no communication rules to consider or violate. My family has not violated any SAM rules.

Many factual assertions proffered by the Defendants can and will be subject to dispute at the appropriate time in this case. This court should conduct a detailed fact-specific analysis of the SAMs restrictions.

Defendants spend a substantial portion of their Motion to Dismiss relaying information from my post-arrest statements and crimes of conviction, and ask this Court to take judicial notice of exhibits transcribing those events because, according to Defendants, the exhibits are publicly filed court records and incorporated by reference based on their centrality to Plaintiff's claims. But under Fed. R. Evid. 201(b), the Court can take judicial notice of only two types of facts: (1) "those that are generally known within the court's territorial jurisdiction; and (2) those that are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Thus, while a court can take judicial notice of ~~findings~~ "documents that are part of the public record," a court "may not take judicial notice of findings of facts from another case" or "of any matter that is in dispute." Walker v. Woodford, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006) Aff'd in part, 393 F. App'x 513 (9th Cir. 2010). Judicial notice may be employed only if

the facts at issue are "not subject to reasonable dispute."
Lozano v. Ashcroft (10th Cir. 2001). "Care must be taken
that the requisite notoriety exists. Every reasonable doubt
upon the subject should be resolved promptly in the negative."
The Estate of Lockett by and through Lockett v. Fallin (10th Cir. 2016)
(quoting Brown v. Piper (1875)). And "on a Rule 12(b)(6) motion
to dismiss, when a court takes judicial notice of another
court's opinion, it may do so 'not for the truth of the
facts recited therein, but for the existence of the opinion.'"

    Defendants request that this court take judicial notice
not just of the criminal-case transcripts and SAMs
themselves, but also of the truth of the facts asserted
in them. Defendants cite no evidence other than the SAMs
to justify their current violations of my legal rights. But
the SAMs rely on my post-arrest statements from more than
eight years ago. This justification is disingenuous and
based on outdated information. As an example, Defendants
provide that I told the FBI that I hoped to inspire others.

to commit similar acts of terror, but what the Defendants and the SAM does not provide are the circumstances under which I made this statement. The circumstances being that, following my arrest, I was hospitalized and treated for life-threatening injuries, including a gunshot wound to the head. I underwent hours of surgery and was prescribed powerful opioid pain-killers like fentanyl. Over a period of 36 hours, two FBI agents questioned me while I was in critical condition in the Intensive care unit, in significant pain, intubated, and confined to my bed. The agents did not provide the warnings required by Miranda v. Arizona, and they rejected my repeated requests for counsel. Held incommunicado and told that I needed to answer the agents' questions, I was coerced to make the statement referenced above. Now, being of sound mind, not under the influence of drugs or coercion by the FBI, I hope the exact opposite, that nobody is ever inspired to commit anything similar to what I've done.

Therefore, while the SAMs are central to my claims,

only the existence of the SAMs themselves is a proper fact on which this Court may take judicial notice. The truth of the facts asserted within the SAMs that purport to justify their existence is a matter "subject to reasonable dispute" that will be addressed during the litigation of this case. Defendants' argument that the Court should take judicial notice and accept as true the justifications asserted within the SAMs would deprive federal courts of the ability to ever strike down the federal government's imposition of SAMs on a federal prisoner. Allowing such a self-serving use of evidence at this early stage of the litigation would be improper under the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

2. Plaintiff adequately alleges that his SAMs violate the First Amendment and are not reasonably related to legitimate penological interests.

Defendants argue that I failed to state a claim in each of Claims 1-3 because I do not refute

that there is a rational connection between the SAMs

restrictions on my First Amendment rights and the government's

purported penological national-security interests. For each of

these three claims, the relevant question at the

motion-to-dismiss stage is whether I pleaded allegations

showing that the penological objectives asserted by the

Defendants are not reasonably related to the specific

restrictions placed on my rights. See Mohammed v. Holder,

(D. Colo. Sept. 29, 2011) ("Because the SAMs at issue are

individually crafted to address the risk associated with

Plaintiff, the question is not whether SAMs, generally, are

rationally related to a penological objective, but instead whether

the Government has shown that there is a rational connection

between the particular SAMs applied to Plaintiff and a

penological objective.") Plaintiff's SAMs restrict his First

Amendment rights, and Defendants' asserted penological objectives

are not reasonably related to these restrictions.

a. Claim 1:

The Defendants assert that the obvious justification for not allowing me to send photographs to my family, is the possibility that my family will violate communication rules by sharing the photographs with unapproved contacts who may then be inspired to commit acts of violence and terrorism. Defendants do not assert that my family members shared my photographs with unapproved contacts (but note, that because my mother, who lives in Russia, violated communication rules by sending a recording of my voice to the media, "national-security officials can reasonably conclude that the risk is too great that Tsarnaev's contacts might do the same with his photographs." The photograph restriction is based on a lie or what the Defendants call a "misapprehension," but now, their predictive judgment and rational basis are supported by another lie. As mentioned previously, my mother shared her recording before the SAMs were implemented. The perceived risk

is not "obvious", but it is grossly exaggerated. Defendants do not assert that my photographs have ever placed national security at risk. And in the years since I sent the photographs to my family, the photographs have not reached media outlets and social media platforms throughout the world. Additionally, in Al-Owhali, 687 F.3d at 1241, the Tenth Circuit noted that Mr. Al-Owhali's pleadings "included no facts indicating that the government lacked a legitimate penological interest in limiting his correspondence." Here, by contrast, I have provided facts showing a lack of penological interest in the violation of my First-Amendment rights. Finally, my parents reside in Russia and are unable to travel thousands of miles to visit me. My photographs brought them joy and comfort, something the Defendants hate to see, so much so that they produce lies to infringe on my right to familial association.

## b. Claim 2:

Defendants assert that there is a rational connection between the restriction on me mailing hobby craft to my approved contacts and national security. Defendants provide that the obvious justification for not allowing me to send my crochet items to my approved contacts is "due to "the risk that these items will fall into the hands of aspiring jihadists" who will then be inspired to commit acts of terror and promote my "violent agenda" by selling or donning the wares. Defendants do not provide by what means unapproved contacts, specifically would-be jihadists, would come into possession of my hand-made items, nor do the Defendants assert that my approved contacts shared my handmade wares with unapproved contacts. Defendants failed to address in their pleadings the fact that they allowed me to send a package of hobby craft, as indicated in paragraph 119 of my Amended Complaint, to a legal contact despite the existing restriction. Defendants' violation of the restriction has

rendered their action arbitrary, capricious, and otherwise not in accordance with law. Nat. Environmental Development Association's Clean Air Project v. EPA, 752 F.3d 999, 1009 (D.C. Cir. 2014) (an agency decision "may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations"). Defendants assert that I failed to allege the absence of a rational justification for the restriction on my mailing handmade wares, but that is plainly untrue. My complaint readily establishes that there is no connection between the restriction on my hobby craft and the one and only "legitimate penological interest" the SAM regulation recognizes: the prevention of a substantial risk of death or serious bodily injury to another person. On September 5, 2019, Defendants did not recognize that my hobby craft posed any risk. Defendants' judgment and rational basis, indeed, their entire argument is defeated by their violation of the restriction. Furthermore, the Defendants arbitrarily deny me my right

as a capital defendant to present a "well-behaved and peaceful adjustment to prison life" as mitigation in the name of perceived "risks." The mitigation point has more than "minimal relevance." "Virtually no limits are placed on the relevant mitigation evidence a capital defendant may introduce concerning his own circumstances," Tennard v. Dretke, 542 U.S. 274, 285 (2004).

Lastly, Defendants cite my "attempts" to circumvent the SAMs, despite their own obvious violation, and argue that, as long as they recite the words "legitimate penological interest," this Court must defer to the challenged restrictions without further inquiry. A district court must await "further factual development," and may not dismiss a prisoner's claim under Rule 12(b)(6). If, however, this Court determines that it cannot deny Defendants' motion outright based on the evidence presented here, then it must deny the motion under Rule 56(d), as there is additional evidence, available through discovery, that will bear dispositively on the issue.

## c. Claim 3:

Defendants argue that, even at the pleading stage, where a plaintiff's allegations must be credited and fact-intensive disputes must not be resolved, my First Amendment rights must give way to the discretion Defendants have under *Turner v. Safley,* 482 U.S. 78 (1987), to protect their "legitimate penological interests." Specifically, Defendants argue that I failed to allege that it is "irrational to limit" the means by which I can communicate with young children and that my pleading does not address the "coherent security rationales for the restrictions." But that is untrue. My complaint establishes that there is no connection between the denial of any of my communication requests and the only "legitimate penological interest" the SAMs regulation recognizes: the prevention of a substantial risk of death or serious bodily injury to another person. In *Turner,* the Supreme Court held that, for a restriction on a prisoner's First Amendment rights to be constitutional, "there must be a 'valid, rational connection' between" the restriction

"and the legitimate governmental interest put forward to justify it." 482 U.S. at 90. The restriction "cannot be sustained where the ... connection ... is so remote as to render" it "irrational" or where it "represents an exaggerated response to the objectives." I have sufficiently pled the absence of any "valid, rational connection" between the Defendants' refusal to allow me to communicate by mail and telephone with my nieces and nephews and the only "legitimate penological reason" for which a SAMs restriction may be imposed, i.e., to avoid a "substantial risk" of "death or serious bodily injury" that such communications may pose to another person. The Amended Complaint demonstrates that the request is to have telephone and written correspondence with my nieces and nephews, all of whom are children, and that any and all communication will be monitored by the FBI. Defendants do not assert that I attempted to incite violence via telephone communications in the past, nor did they ever have to terminate any one

of my phone calls, and yet, they allege that they have a legitimate interest in preventing me from "attempting to inculcate a desire to harm the United States in these vulnerable young children." Defendants provide "violence and terrorism can become a family affair," and cite Nickolson 2017 WL 4337896. In Nickolson, the plaintiff was originally convicted of conspiracy to commit espionage, and the court found the SAMs restrictions rationally related to penological interests because, inter alia, plaintiff pled guilty to assisting one of his sons in conspiracy and money laundering while he was incarcerated. Here, by contrast, my crimes are not tied to concerns about communications. I have not attempted to incite violence via telephone communications with individuals outside of prison, and I do not intend to do so. The restriction on my telephone and written correspondence has had a chilling affect on my relationship with my nieces and nephews and unless they travel thousands of miles to visit me, I am unable to greet them, tell them I love them, and be a

regular part of their lives.

Defendants argue that they have "legitimate penological interests" that allow them to impose these restrictions and ask the Court to dismiss my claim under Rule 12(b)(6). A district court must await "further factual development," and may not dismiss a prisoner's claim under Rule 12(b)(6), based on deference to prison officials' "judgment," unless the connection between the challenged restriction and an identified "legitimate penological interest" is so "obvious" as to be "a matter of common sense." Wolf v. Ashcroft (3rd Cir. 2002). In this case, there is no articulated connection, let alone an obvious, common sense one, between prohibiting me from exchanging pre-screened letters and having live-monitored telephone calls with any of the nine nieces and nephews who are all children on the one hand, and the Defendants' interest in eliminating "substantial risk" of "death or bodily injury" on the other. 28 C.F.R. § 501.3(c).

Additionally, Defendants arbitrarily chose six nieces and

nephews with whom I can have written correspondence but exclude three others. Defendants provide that the three children not afforded writing priveleges reside with unapproved contacts but that rationale does not withstand scrutiny because the six children approved to correspond with me also reside with unapproved contacts, mainly, their fathers, my-in-laws. Alternatively, since my nieces and nephews can only visit me if accompanied by my sisters, then I can send all of my pre-screened letters to my nine nieces and nephews to my sisters' homes. My sisters will supervise and keep my pre-screened letters out of the hands of any unapproved contacts. Thus, alleviating the Defendants' security concerns.

Lastly, I did not meet the standards for pleading an Eighth Amendment violation.

d. Claim 4

The Court may dismiss this claim. I no longer wish to challenge the entirety of the SAMs.

### e. Claim 7

I was advanced to Phase 2 seven months ago.
I no longer have a standing claim.

### Conclusion

The complaint alleges sufficient facts to establish violations of my rights to correspondence and familial association. Thus, Defendants' motion to dismiss Claims 1-3 for failure to state a claim should be denied.

Respectfully submitted,

Dzhokhar Tsarnaev

Plaintiff

Dated: November 15, 2021.

**Name:** Dzhokhar Tsarnaev

**Reg No.:** 95079-038

**U.S. Penitentiary MAX**

**P.O. Box** 8500

**Florence, CO.** 81226-8500

CM 21-95079038-1115-MD-009

Office of the Clerk
United States District Court
901-19th Street, Room A105
Denver, CO 80294-3589



