IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00010-MEH

DZHOKHAR TSARNAEV,

     Plaintiff,

v.

MERRICK GARLAND, Attorney General of the United States, and
B. TRUE, Warden of Florence ADMAX Facility,

     Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

    Defendants have filed a Motion to Dismiss Pursuant to Rule 12(b)(6). ECF 32. They have also filed a Motion for Partial Summary Judgment. ECF 33. The Motions are fully briefed. The Court rules on the Motions as follows.

## BACKGROUND

    Plaintiff initiated this lawsuit on January 4, 2021.  ECF 1.  He filed his Third Amended Prisoner Complaint (TAC) on June 4, 2021. ECF 11. He alleges First, Fifth, and Eighth Amendment violations pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971), arising from the Federal Bureau of Prisons' (BOP) implementation of Special Administrative Measures (SAMs), 28 C.F.R. § 501.3, at the United States Penitentiary, Administrative Maximum Facility in Florence, Colorado (ADX).

    The TAC asserts the following causes of action:

    <u>Claim One</u>: Violation of the First Amendment (including familial association) by restricting outgoing correspondence. Plaintiff specifically seeks the right "to send

photographs and hobby craft to my family and to my attorneys." ECF 11 at 6. Plaintiff's narrative of this claim appears to be limited to the restriction on sending photographs of himself to his family and his attorneys.

<u>Claim Two</u>: Violation of the First Amendment (including familial association) by restricting outgoing correspondence. This claim appears limited to Plaintiff's desire to send "craft [*i.e.*, hobby craft] items to people I care about, including members of my legal team." *Id*. at 14.

<u>Claim Three</u>: Violation of the First and Eighth Amendments (including familial association) by restricting outgoing correspondence. This claim appears limited to Plaintiff's desire "to have calls or to correspond with [my nieces and nephews] by mail." *Id*. at 15.

<u>Claim Four</u>: Violation of the Fifth Amendment due process clause based on the inclusion in Plaintiff's SAM of an incident report for removing and retaining a "metal nose" from a protective mask (issued to him for COVID purposes), but the charge being later dropped (and yet still included in the SAM) when the BOP determined that the mask never had a metal nose.

<u>Claim Seven</u>: Violation of the Fifth Amendment due process clause by refusing to advance Plaintiff to lower phases of confinement within his unit (H Unit) despite his meeting the express terms and requirements of the BOP's program for step downs.

In their Motion to Dismiss, Defendants make statements about Plaintiff's prior history and current political and religious views. I include here the summary of the circumstances that preceded Plaintiff's placement at ADX, which was provided by the United States Supreme Court in its recent opinion that reinstated his sentence of death after the First Circuit had vacated it.

[Dzhokhar and Tamerlan Tsarnaev] immigrated to the United States in the early 2000s and lived in Massachusetts. Little more than a decade later, they were actively contemplating how to wage radical jihad. They downloaded and read al Qaeda propaganda, and, by December of 2012, began studying an al Qaeda guide to bomb making.

On April 15, 2013, the brothers went to the Boston Marathon finish line on Boylston Street. They each brought a backpack containing a homemade pressure-cooker bomb packed with explosives inside a layer of nails, BBs, and other metal scraps. Tamerlan left his backpack in a crowd of spectators and walked away. Dzhokhar stood with his backpack outside the Forum, a nearby restaurant where spectators watched the runners from the sidewalk and dining patio. For four minutes, Dzhokhar surveyed the crowd. After speaking with Tamerlan by phone, Dzhokhar left his backpack among the spectators. Tamerlan then detonated his bomb. While the crowd at the Forum looked toward the explosion, Dzhokhar walked the other way. After a few seconds, he detonated his bomb.

Each detonation sent fire and shrapnel in all directions. The blast from Tamerlan's bomb shattered Krystle Campbell's left femur and mutilated her legs. Though bystanders tried to save her, she bled to death on the sidewalk. Dzhokhar's bomb ripped open the legs of Boston University student Lingzi Lu. Rescuers tried to stem the bleeding by using a belt as a makeshift tourniquet. She too bled to death.

Eight-year-old Martin Richard absorbed the full blast of Dzhokhar's bomb. BBs, nails, and other metal fragments shot through his abdomen, cutting through his aorta, spinal cord, spleen, liver, pancreas, left kidney, and large intestines. The blast propelled shrapnel with such force that it exited his back. Other shrapnel nearly severed his left hand. The explosion also caused third-degree burns. Martin ultimately died from blood loss.

Dzhokhar's and Tamerlan's bombs maimed and wounded hundreds of other victims. Many people lost limbs, including Martin's 6-year-old sister, Jane. Many more would have died if not for the swift action of citizens and first responders.

After fleeing the scene, the brothers returned to their normal lives. Dzhokhar attended his college classes the next day. He went to the gym with friends. He posted online that he was "a stress free kind of guy." App. 145. Several days later, on April 18, after the Federal Bureau of Investigation (FBI) released images of the suspected bombers, a friend saw the images and texted Dzhokhar. Dzhokhar responded: "Better not text me my friend. Lol." *Id.*, at 146.

Recognizing that investigators were closing in on them, Dzhokhar met up with Tamerlan that evening. The brothers collected more homemade bombs and a handgun and loaded them into Tamerlan's car. While driving past the Massachusetts Institute of Technology, they saw 27-year-old campus police officer Sean Collier sitting in his patrol car. They approached his car and shot him five times at close range, including once between the eyes. With Collier dead, the brothers tried to steal his service pistol but were unable to remove it from the holster. They then carjacked and robbed another man, Dun Meng, who was driving his SUV home from work. When the brothers forced Meng to stop at a gas station for fuel and snacks, he fled on foot. The brothers briefly chased him but gave up and made off with Meng's SUV.

Meng contacted the police, who used the SUV's GPS device to track the Tsarnaevs. When officers found the brothers in Watertown a few hours later, a street battle ensued. Tamerlan fired on the officers with a handgun, while Dzhokhar threw homemade bombs. When Tamerlan's handgun ran out of ammunition, officers subdued him. As they tried to handcuff Tamerlan, Dzhokhar returned to the SUV and sped towards the officers. They evaded the SUV. Tamerlan did not. Dzhokhar ran over Tamerlan and dragged him roughly 30 feet down the road. Tamerlan disentangled from the undercarriage when Dzhokhar rammed a police cruiser before escaping. Tamerlan died soon after from his injuries.

Dzhokhar abandoned the SUV a few blocks away. He found a covered boat in a nearby backyard. Taking shelter inside, he carved the words "stop killing our innocent people, and

we will stop" into the planking. *Id*., at 151. He also wrote a manifesto in pencil on the bulkhead of the boat's cockpit justifying his actions and welcoming his expected martyrdom. The next day, the boat's owner found him. Police eventually forced Dzhokhar out of the boat and arrested him.

*United States v. Tsarnaev*, No. 20-443, 2022 WL 626692, at *3–4 (U.S. Mar. 4, 2022). A District of Massachusetts jury convicted him of all charges and recommended a death sentence on several of the death-eligible counts — a sentence that the district judge imposed (among other sentences). Defendants include substantial additional information about Plaintiff's conduct in prison, his alleged current political views, and his continued dangerousness within the terrorist community. Because Plaintiff does not mount a general challenge to the fact that he is under SAMs but rather attacks the basis for several particular SAMs, it is unnecessary for me to comment on the legal justification for Plaintiff to be placed on SAMs. I will consider, at the appropriate time, Plaintiff's post-arrest conduct insofar as it is relevant to the justifications for particular SAMs that Plaintiff is challenging.

## LEGAL STANDARDS

### I.      Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In this context, plausibility means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Twombly requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions,

bare assertions, or merely conclusory. *Id*. at 679. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## II.     **Treatment of a Pro Se Plaintiff's Complaint**

A pro se plaintiff's "pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). "Th[e] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Smith v. United States*, 561 F.3d 1090, 1096 (10th Cir. 2009) (quoting *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997)). The Tenth Circuit interpreted this rule to mean, if a court "can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, [it] should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (quoting *Hall*, 935 F.2d at 1110). However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Garrett*, 425 F.3d at 840 (quoting *Hall*, 935 F.2d at 1110).

Finally, in the context of a motion to dismiss concerning the constitutionality of SAMs, the Tenth Circuit has stated that "a court need only assess, as a general matter, whether a prison regulation is 'reasonably related to a legitimate penological interest.'" *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010)). Further:

> Taken together, *Iqbal* and *Turner* require an inmate to "plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest." *Gee*, 627 F.3d at 1188. "This is not to say that [Al–Owhali] must identify every potential legitimate interest and plead against it." *Id*. However, he is required to "recite[ ] facts that might well be unnecessary in other contexts" to surmount a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Gee*, 627 F.3d at 1185.

*Al-Owhali*, 687 F.3d at 1240.

6

III.    **Summary Judgment**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense— his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id*. at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo*., 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## IV.    **Exhaustion**

An inmate's grievance process starts with filing an informal resolution form (BP-8). If that does not resolve the issue, the inmate must file an administrative remedy request (BP-9). If that is denied, he must file an appeal (BP-10) to the regional office. If that is likewise denied, he must file his last appeal to the central office of the BOP, a BP-11. This four-stop process has been addressed and approved by the Tenth Circuit numerous times. "An inmate has not exhausted his administrative remedies until completing each of these steps." *Eldridge v. Berkebile*, 576 F. App'x 746, 747 (10th Cir. 2014). In the normal course, failure to adhere to all four steps merits dismissal of a claim. *Patel v. United States*, 399 F. App'x 355, 360 (10th Cir. 2010). The Supreme Court has held that proper exhaustion means complying not only with an agency's deadlines, but also its procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

## ANALYSIS

### I.   <u>Background of Plaintiff's SAMs</u>

The TAC attacks the constitutionality of the SAMs as applied in certain contexts to Plaintiff.  Although I follow the standards supplied by case law and the Federal Rules of Civil Procedure, for proper background I note here that for three years (2017-19), I served as the monitor in H Unit (Plaintiff's residential unit) arising out of the settlement agreement in *Cunningham et al. v. Federal Bureau of Prisons et al.,* 12-cv-01570-CMA-MEH (D. Colo.), a prison conditions lawsuit. My monitoring responsibilities entailed quarterly visits to that ADX unit for purposes of assessing the provision of mental health services to the inmates. These visits included speaking with Plaintiff (and other inmates, of course), as well as with defense counsel from the United States Attorney's Office. Thus, I was one of those "representatives of the U.S. courts [and] federal judges" that the SAMs permitted to have contact with inmates. Mot., ECF 32 at 5 n.2.

Because the District of Colorado is in the Tenth Circuit, I will look to any relevant decisions from that appellate body concerning the SAMs (the United States Supreme Court having never weighed in on the matter). SAMs are a means to limit privileges for certain federal inmates. 28 C.F.R. § 501.3(a) (AR 501); *see also Ghailani v. Sessions*, 859 F.3d 1295, 1298 (10th Cir. 2017). SAMs may be imposed by the BOP upon its finding "'of a substantial risk that a prisoner's . . . contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.'" *Id.* (quoting AR 501). SAMs must be "reasonably necessary to protect persons against the risk of acts of violence or terrorism." *Id.* (quoting AR 501). In addition, SAMs "must be based on findings specific to the inmate which demonstrate the risk posed by the inmate's contacts and communications. The U.S. Attorney General must first instruct the Director of the Bureau of

Prisons to issue the SAMs, and then the Director authorizes the prison warden to enforce them." *Id.* at 1298-99. SAMs have a one-year duration; the only way the BOP may extend them on an inmate is by written notification from the U.S. Attorney General stating that "'there continues to be a substantial risk that the inmate's communications or contacts with other persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.'" *Id.* at 1299 (quoting AR 501). The BOP must provide written notification to any inmate subject to the SAMs providing the basis for that inmate's SAMs. *Id.* The inmate may seek administrative review of his restrictions. *Id.*

The BOP first imposed SAMs on Plaintiff on August 27, 2013, ECF 32-1 at 3, shortly after the crime in question and approximately two years before his conviction and sentence. I must consider Plaintiff's current SAMs, because the lawsuit involves only official capacity claims for declaratory and injunctive relief. *See Davis v. Fed. Bureau of Prisons*, 798 F. App'x 274, 277 (10th Cir. 2020) (affirming dismissal of claims concerning restrictive confinement measures as moot, when they are no longer in effect). However, I note that the mere expiration of a particular SAM will not necessarily moot a claim against it, because the attack on that SAM may be capable of repetition yet evading review. *Al-Owhali*, 687 F.3d at 1242. Alternatively, when the U.S. Attorney General has withdrawn SAMs completely from a particular inmate based on a statement justifying, on the facts, the basis for withdrawing the SAMs, and those SAMs have been eliminated for a significant period of time (*e.g.*, several years), an attack against previously imposed restrictions will be dismissed as moot. *Ghailani*, 859 F.3d at 1302 (inmate's co-conspirators were already captured or killed; inmate demonstrated good conduct in prison; inmate's notoriety and ability to inspire others had waned over the approximately twenty years since the terrorist incident; and inmate had expressed remorse over his actions).

Although Plaintiff objects to the use of materials outside the pleadings in deciding this Motion, I agree with Defendants that at least as to Plaintiff's current SAMs, I may consider them because they are referenced in and central to the TAC, and their authenticity is not disputed. *Gee*, 627 F.3d at 1186 (although documents district court may review in a 12(b)(6) are quite limited, documents that are central to the complaint and whose authenticity is not disputed may be considered). Plaintiff's current SAMs, issued on September 1, 2021 (well before the filing and briefing of the current Motion), are at ECF 32-1 (Notification of Extension of Special Administrative Measures (SAM)). I will address them as relevant to Plaintiff's five claims.

## II.    Standard for First Amendment Claim

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Among other factors, the courts must evaluate whether a particular regulation or restriction is logically connected to the legitimate interest. *Id.* at 89-90. If the connection appears too remote, it may render the policy arbitrary or irrational. *Id.* When an alternative to the restriction fully accommodates a prisoner's rights at *de minimis* harm to the penological interest, the court "'may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.'" *Shabazz v. Parsons*, 127 F.3d 1246, 1249 (10th Cir. 1997) (quoting *Turner*, 482 U.S. at 91). It is the inmate's burden to establish there is no legitimate, rational basis for the communication restrictions. *Al-Owhali*, 687 F.3d at 1241.

## III.   Plaintiff's Claims

### A.    Claim One – Photographs to Family and Counsel

Under Plaintiff's SAMs, he is "prohibited from sending any hobby crafts or photographs via non-legal mail." ECF 32-1 at 13.

Defendants have moved for summary judgment on Claim One, for failure to exhaust a claim concerning the SAMs' prohibition on Plaintiff sending photographs of himself outside the prison. Defendants admit Plaintiff did properly initiate a challenge on this issue. The informal process for this challenge failed, as did the administrative remedy request (BP-8 & 9). After the initial failure at the institution level, Plaintiff filed his first appeal (BP-10) to the region, and that was denied. He then filed his appeal to the central office (BP-11), but the BOP notified him it was denied on procedural rather than substantive grounds and instructed him to re-submit a properly documented appeal within fifteen days. He did not.

Defendant argues that although Plaintiff may have filed an initial BP-11, his omission in not refiling after being given an opportunity to do so constitutes a lack of proper exhaustion. *E.g., Jackson v. Davis*, No. 09-cv-01532-ZLW, 2009 WL 3122892, at *1–2 (D. Colo. Sept. 24, 2009) (finding failure to exhaust when the plaintiff "failed to complete the administrative remedy process by failing to resubmit his BP-11 appeal with the proper documentation"); *see also Turner v. Wilner*, No. 08-cv-01454-ZLW, 2008 WL 4610262, at *2 (D. Colo. Oct. 16, 2008) (finding that plaintiff failed to properly exhaust because the "administrative remedy request was rejected on procedural grounds and [he] did not refile a proper administrative remedy request despite being given an opportunity to do so").

Plaintiff does not deny his failure to exhaust as outlined above. However, he argues the following: The BOP's grievance process, 28 C.F.R. § 501.3(e), permits inmates to seek review of SAMs restrictions. But under *Ross v. Blake*, 578 U.S. 632 (2016), the BOP's process for challenging a SAM is not an "available" administrative remedy (as that term is used in the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)). Plaintiff explains that although the BOP "implements the SAMs restrictions, it has no decision-making authority to modify it. . . . Defendant

Garland has the sole authority . . . whether . . . to modify SAMs." ECF 39, Resp. at 4. Plaintiff quotes the decisions at the institution and region levels which both state that the BOP cannot modify Plaintiff's SAMs.

Defendants reply that the Tenth Circuit addressed this precise argument in *Yousef v. Reno*, 254 F.3d 1214 (10th Cir. 2001). This is partially true. In *Yousef*, the inmate admitted that his ultimate challenge was to the constitutionality of the SAMs, and undoubtedly, the BOP has no authority to eliminate the SAMs of an inmate. Implicit in the court's decision was that a challenge to the constitutionality of the SAMs *alone* might not need to be exhausted. Indeed, the Attorney General stated that "the BOP is powerless to review the legality and fairness of the SAMs." *Id.* at 1222. But in *Yousef*, the Attorney General also affirmatively and clearly stated that "the BOP is authorized to rule on challenges to specific SAMs," including challenges to the inmate's "limitations on non-English communications, and to restrictions on his carrying of religious materials into an exercise area." *Id.* Moreover, the BOP "may modify particular conditions of an inmate's confinement." *Id.* Thus, *Yousef* involved a "mixed" claim with both a challenge to the constitutionality of the SAMs and to the "fairness" of specific SAMs. This is similar to the challenges made by Plaintiff here (although Plaintiff has withdrawn an attack on the general constitutionality of the SAMs). In *Yousef,* the court's analysis relied on this specific statement by the U.S. Attorney General regarding the BOP's authority to modify a SAM. Therefore, the Tenth Circuit held the BOP's administrative remedies were "available" and the prisoner must exhaust them.

Defendants' reply then argues that through the BOP's grievance process, the BOP transmits the inmate's complaint to three Department of Justice units: the United States Attorney's Office in the District of Massachusetts (the original prosecutors), the Federal Bureau of Investigation, and

the Office of Enforcement Operations. Defendants have attached to their summary judgment motion the denial of Plaintiff's grievance by the warden in which he states that the BOP "does not have the authority to modify" the SAM. He further states that only those three Justice Department units, in concurrence, can modify Plaintiff's SAMs. ECF 33-1 at 95. He states that "[f]ollowing review [presumably by those three units], it was determined that the SAM has been properly applied." *Id.* He concludes this communication not by specifically denying Plaintiff's grievance but by stating that the communication "is for informational purposes only" because the authority on altering the SAMs rests with the three Justice Department units.

I am not satisfied with the vague and veiled language used here. Even the Tenth Circuit in *Yousef* stated that the BOP's wording in its decision there was "misleading." 254 F.3d at 1222. The passive tense in the warden's statement that "it was determined" does not attribute the decision to anyone. He also stated that the three Justice Department units determined that the SAM "has been properly applied." I do not know what this means but, grammatically, the warden said that the BOP applied the SAM as drafted. That, of course, is not the issue, but rather whether in its proper application, some right of Plaintiff is being violated by a SAM. Furthermore, unlike in *Yousef*, Defendants here make no clear statement by the U.S. Attorney General that the BOP *still* has the authority to modify the SAMs of *this* Plaintiff. If the BOP actually forwards grievances to those three Justice Department units; and if those three units in concurrence actually denied Plaintiff's grievance; and if the BOP still has authority to modify specific SAMs when appropriate as stated in *Yousef*, the government ought to say it clearly.

I do not have any record evidence whether the BOP's process regarding challenges to individual SAMs provisions has materially changed since *Yousef*. Other courts have found that the BOP grievance process is an "available" administrative remedy for SAMs. *E.g., Abdulmutallab v.*

*Barr*, No. 17-cv-02493-RM-KMT, 2019 WL 4463282, at *6 (D. Colo. Sept. 18, 2019); *United States v. Savage*, No. CRIM.A. 07-550-03, 2010 WL 4236867, at *3 (E.D. Pa. Oct. 21, 2010). *Yousef* itself found the same. Yet this holding is not unanimous. In *Sattar v. Gonzales*, No. 07-cv-02698-WDM-KLM, 2009 WL 606115 (D. Colo. Mar. 6, 2009), the court held:

> The responses to his administrative appeals all indicated that the BOP would not engage in any reduction, alteration, or recission of the specific SAMs and that the determination of the SAMs was left to the Attorney General. As Plaintiff was afforded no avenue to appeal to the Attorney General, he was not provided with a meaningful opportunity to be heard.

*Id.* at *9.

In a case postdating *Yousef* — *Ross*, 578 U.S. 632 — the Court held that when "an administrative remedy, although officially on the books, is not capable of use to obtain relief . . . an inmate's duty to exhaust 'available' remedies does not come into play." *Id.* at 643. The Court gave three examples of such an instance, including "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable . . . to provide any relief to aggrieved inmates." *Id.* The Tenth Circuit has indicated its receptiveness (as it must) to a *Ross*-type challenge when the inmate points to evidence in the record to support such a factual finding. *Ryan v. Corr. Corp. of Am.*, 715 F. App'x 831, 834 (10th Cir. 2017). However, I could find no cases applying *Ross* to Special Administrative Measures under 28 C.F.R. § 501.3.

"[T]he failure to exhaust is an affirmative defense and . . . the burden of proof is on the defendants." *Burnett v. Miller*, 738 F. App'x 951, 953 (10th Cir. 2018). While this burden has not yet been met here, I do not believe outright denial of Defendants' motion for summary judgment concerning exhaustion is appropriate at this point. Because it is possible (perhaps even likely) that clarification of the language used by Defendants (by a person with actual authority over the SAMs) will resolve the issue, I will permit Defendants to supplement the summary judgment record with

unambiguous evidence (*e.g.*, decisional documents, a supplemental declaration under oath, or other appropriate submission under Fed. R. Civ. P. 56(c)(1)(A))[1] concerning the BOP's authority to modify a particular SAM; the BOP's process in this case of referring Plaintiff's actual grievance to the three Justice Department units; and whether those units actually did consider and reject the grievance. Plaintiff will have the opportunity to respond to this supplemental record.

Because the issue as to Plaintiff's exhaustion of Claim One has not yet been resolved, I reserve any ruling on Defendants' Motion to Dismiss this claim.

B.    Claim Two – Hobby Craft to Family and Counsel

As noted above, under Plaintiff's SAMs, he is "prohibited from sending any hobby crafts or photographs via non-legal mail." ECF 32-1 at 13.

Claim Two is identically situated, insofar as exhaustion is concerned, with Claim One. Defendants have moved for summary judgment on Claim Two for failure to exhaust. I make the same ruling as to Claim Two as I have with Claim One.

C.    Claim Three – Telephone Calls and Correspondence with Nieces and Nephews

1.    Telephone Calls

Defendants have not moved for summary judgment on Claim Three regarding telephone calls or written correspondence. They are moving to dismiss it under Fed. R. Civ. P. 12(b)(6).

Plaintiff's current SAMs authorize him to only have telephone calls "with your immediate family members." ECF 32-1 at 10. The SAMs define "immediate family members" as "spouse, children, parents, and siblings." *Id.* Nieces and nephews are not included as permitted family

---

[1] Rule 56(e) permits supplementation of record for summary judgment purposes where appropriate, specifically, if a party fails to properly support an assertion of fact, "the court may (1) give an opportunity to properly support or address the fact . . . or . . . (4) issue any other appropriate order." *See Stella v. Anderson*, 844 F. App'x 53, 58 & n.3 (10th Cir. 2021).

members. The SAMs do permit Plaintiff to request additional non-legal telephone contacts, and any such request is considered "on a case-by-case basis." *Id.* For any explicitly permitted telephone call, no third party may listen in any manner, the contents of any such call may not be "divulge[d] in any manner to a third party," and the call may not be recorded or preserved. *Id.* at 11. Therefore, no immediate family member may permit a niece or nephew to listen to a call, nor may they describe any such call to a niece or nephew.

All nieces and nephews are permitted to visit Plaintiff in person, if accompanied by an approved person (one of Plaintiff's sisters). Thus, the SAMs draw a distinction for all nieces and nephews between telephone calls (completely prohibited) and in-person visits (permitted).

Defendants correctly point out the pleading burden when attaching a prison regulation. I note the *Al-Owhali* decision holding that Plaintiff must plead facts from which a plausible inference can be drawn that his restriction was not reasonably related to a legitimate penological interest. He need not identify every potential legitimate penological interest but must present facts that might well be unnecessary in other contexts. *Al-Owhali*, *supra*. Defendants' argument focuses on the underlying justification for placing Plaintiff under SAMs (*i.e.*, his prior acts and continued alleged dangerousness), but I do not construe Plaintiff's claims as challenging the fact that SAMs have been placed on him. In this case I review only the legitimate penological interest for each of the specific SAMs Plaintiff challenges.

The TAC alleges that BOP policy, even at the ADX, permits inmates to visit with family members and friends. ECF 11 at 15. Plaintiff acknowledges his ability to speak with parents and sisters by telephone, but if his nieces and nephews say something to him, the call is terminated. *Id.* He states that he can have in-person visits with nieces and nephews but not telephone calls. *Id.* He also states that he made a request for the additional telephone contacts, but it was denied. *Id.* He

alleges the restrictions are greater than necessary to protect the legitimate government interests of security, order, rehabilitation, and prevention of violence or terrorism. *Id.* at 16. I find this meets the Tenth Circuit's requirement of pleading a challenge to the government's legitimate interests for this claim.

Although the TAC alleges both a First Amendment and Eighth Amendment basis, I agree with Defendants that Plaintiff cannot state a claim for cruel and unusual punishment based on a limitation with whom he may communicate (as opposed to a prohibition on all outside communication). *Grissom v. Roberts*, 902 F.3d 1162, 1174 (10th Cir. 2018) (addressing degree of social contact of inmate in relation to an Eighth Amendment claim); *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 756 (10th Cir. 2014) (same); *Wirsching v. Colorado*, 360 F.3d 1191, 1205 (10th Cir. 2004) ("[V]isitation with a particular person does not constitute basic necessity, the denial of which would violate the Eighth Amendment."). Therefore, I analyze this claim only under the First Amendment.

Regarding the distinction the SAMs draw between in-person and telephone calls, Defendants' first explanation of a legitimate penological interest is that "[t]elephone calls, of course, occur in real-time, and dangerous communications can quickly be transmitted before monitors can break the call." Mot. at 17, ECF. 32. Further, "[c]hildren . . . are highly vulnerable to influence and may be particularly susceptible to proclamations from their uncle. The government has a legitimate interest in preventing Tsarnaev from attempting to inculcate a desire to harm the United States in these vulnerable young children." *Id.*

Any challenged prison regulation must "bear a rational relationship to legitimate penological interests." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). And any rational basis test depends on a reasonably conceivable state of facts that could provide a rational basis for a

regulation. *E.g.*, *Khaliq v. Angelone*, 72 F. App'x 895, 901–02 (4th Cir. 2003). Even assuming the legitimate interest in protecting children from terrorist indoctrination, I cannot discern a rational basis *in the record* for treating Plaintiff's in-person and telephone communications differently. Both are monitored in real time by either U.S. Marshals, BOP staff, or Federal Bureau of Investigation personnel, and both could involve dangerous communications transmitted quickly before the monitor can break the conversation.[2] All conversations (in person or telephone) must occur in the English language unless an approved, fluent translator is available to interpret the conversation. All conversations (in person or telephone) may be terminated immediately if the monitoring reveals any violations of the rules.[3] All conversations (in person or telephone) occur with advance notice on the part of the BOP. If, in furtherance of the government's legitimate penological interest, the U.S. Attorney General has determined that Plaintiff may speak with certain nieces and nephews in person, and there is no rational basis in distinguishing between the government's ability to enforce the SAMs via telephone or with in-person conversations, Plaintiff has stated a claim, at least for Rule 12(b)(6) purposes. *Thornburgh v. Abbott*, 490 U.S. 401, 416 n.13 (1989) (prison's distinction between treatment of prisoner's union materials and his materials from the Jaycees and Alcoholics Anonymous had a rational basis in the legitimate penological interest of the prison).

The one argument Defendants provide is that "national-security officials can rationally conclude that the risks of successfully passing dangerous communications are higher by telephone

---

[2] Defendants do not allege any prior instance of a dangerous communication by Plaintiff, nor of any conversation that had to be cut off. This might, in any event, be outside my ability to consider in a 12(b)(6) motion.

[3] The SAMs for telephone calls explicitly states this. Although neither party argues this point, I will assume that in-person conversations would likewise be terminated immediately if the monitor believes the SAMs are being violated.

than during in-person visits, where both Tsarnaev and his family—who will have traveled hundreds, if not thousands, of miles to visit him—may be less inclined to risk termination of the visit by breaking the rules." Mot. at 17, ECF 32. Defendants cite no actual analysis or fact determination in making this blanket statement. In fact, they cite to no such conclusion at all, they merely argue that the government could rationally conclude that. Even given that the Motion is under Rule 12(b)(6) and generally cannot include materials extraneous to the pleadings unless justified by an established judicial doctrine, Defendants point to nothing in any record that supports their proffered rationale. *See Boles v. Neet,* 486 F.3d 1177, 1182 (10th Cir. 2007) ("[W]e could find no evidence in the record of any penological objectives served by [the Warden's] actions."); *Shabazz v. Parsons*, 127 F.3d 1246, 1249 (10th Cir. 1997) (discussing prior remand that required parties to supplement record to establish whether rational basis existed for prison's refusal to permit inmate to receive magazine); *Al-Owhali*, 687 F.3d at 1241 (holding that the warden's written justification in the record was "at least a coherent explanation of the government's policy" why inmate could not correspond with nieces and nephews); *Boles v. Neet*, No. 03-cv-00557-WYD-KLM, 2009 WL 3158125, at *2 (D. Colo. Sept. 29, 2009) (on remand, after Warden and prisons director submitted affidavits addressing legitimate penological interests, district court dismissed case); *see also Cox v. Denning*, No. 12-2571-DJW, 2014 WL 4843951, at *18 (D. Kan. Sep. 29, 2014) ("The Court concludes that Defendants here have not presented any evidence supporting a *valid*, *rational* connection between the Detention Center's [challenged] policy and the security or safety interest advanced for it.") (emphasis in original). The otherwise unattributed statement in the Motion appears to be counsel's argument, logic, or surmise — not a statement or

conclusion by someone authorized to make it.[4] *Al-Owhali*, 687 F.3d at 1241 (noting that, in support of restrictions on inmate's correspondence, the warden, in the SAMs, gave "a coherent explanation of the government's policy"). Unlike in *Al-Owhali*, the current SAMs give no explanation whatsoever in the "Basis for Special Administrative Measures" section regarding nieces and nephews; the actual restrictions merely state the restrictions regarding nieces and nephews without providing any analysis for the distinction; and the warden provides no justification.

The in-person visits are non-contact. The BOP has the physical ability to sever an in-person conversation immediately to the same extent as a telephone conversation, so long as its representative or agent exercises the same degree of attentiveness in both situations. Even in according substantial deference to prison administrators who reasonably exercise judgment in these matters, and upon whom the responsibility rests for anything that goes wrong, *see Overton*, 539 U.S. at 132, I still have to be presented with *some* articulable basis made by a responsible government authority giving the basis for the distinction drawn by the SAMs.

2.    Correspondence

Plaintiff's non-legal mail (*i.e.*, correspondence) is similarly limited -- as far as relatives are concerned -- to "immediate family"; however, the SAMs explicitly extend written correspondence permission to his three nephews I.A.B., D.K., and Y.K, and to his three nieces I.B., S.A.K., and J.S.B. ECF 32-1 at 13. These specific nieces and nephews reside with either of Plaintiff's sisters, and those sisters are approved contacts. There are three nieces and nephews with whom Plaintiff may not communicate remotely, either in writing or by telephone. For all those who are approved

---

[4] I could just as easily posit that in-person visits, which all nieces and nephews may do under the SAMs, provide an opportunity for nonverbal communication between Plaintiff and others that a telephone conversation could not afford. The missing element is the decisionmaker's viewpoint, not mine or counsel's.

to receive written communication from Plaintiff, Plaintiff may send correspondence once per calendar week to a single recipient, up to three pieces of paper (double sided) at a time.

The decisional document that I agree may be considered on a 12(b)(6) motion to dismiss, the September 1, 2021 SAMs ("NOTICE TO: DZHOKHAR TSARNAEV"), gives the names of the six nieces and nephews to whom Plaintiff may send correspondence. It does not mention Plaintiff's other three nieces and nephews whatsoever. Because it does not mention them at all, it does not state that these three reside with an unapproved contact. Defendants argue that this is the reason for the distinction, but I have no record evidence of it. Defendants also argue that "[n]ational-security officials can reasonably decide that allowing written correspondence from Tsarnaev to be sent to a household in which unapproved contacts reside will readily make its way into the hands of those unapproved persons, thus undermining the government's security decision not to approve those contacts in the first place." ECF 32 at 18. I have no reason to doubt this logic, but it does not come from any decision or analysis by the U.S. Attorney General or the three Justice Department units discussed above. The Motion to Dismiss does not attribute this analysis to any of those decisionmakers. Finally, Defendants point to a statement in the SAMs that in May 2013, before Plaintiff was under any SAMs, he made a telephone call to his mother who recorded and released portions to the media. If this is the rational basis in the record, the problem is that that statement is not linked to any restrictions on phone calls with nieces and nephews, it is simply included in the section of the September 21, 2021 letter setting forth the underlying rationale for the imposition of SAMs on Plaintiff. Again, if that is the basis for the telephone restriction, some decision (such as one of the grievance denial memoranda) should have stated it.

Thus, I find the Motion to Dismiss the correspondence claim suffers from the same infirmity as the telephone claim—lack of record evidence of the type which I would be permitted to consider in evaluating a Rule 12(b)(6) motion.

While I suspect neither the telephone nor correspondence claims would withstand summary judgment if the Defendants' explanation was presented in a form I could consider, I am constrained under the *Gee* decision to matters within the four corners of the TAC, as well as the SAMs themselves. Therefore, the Motion to Dismiss Claim Three is denied. This does not mean that discovery is appropriate on this claim. I will reserve ruling on that matter until further consideration of the parties' respective positions.

D.   Claim Four – Use of Withdrawn Incident Report in SAMs

Plaintiff contends that his SAMs were justified in part on an incident report for him removing and retaining a "metal nose" from a protective mask (issued to him for COVID purposes). He alleges this charge was later dropped (when the BOP determined that the mask never had a metal nose in the first place) yet still included in the SAM. Defendants acknowledge that the 2020 SAMs included a statement of this nature, but the current 2021 SAMs do not. Because this lawsuit seeks only injunctive relief, and Plaintiff's current SAMs are not based on any such incident, this claim is moot and is dismissed under *Davis*, 798 F. App'x at 277. In any event, in his response, Plaintiff withdraws Claim Four. ECF 36 at 20. It is dismissed as moot.

E.   Claim Seven – Denial of Step Down

In his response, Plaintiff withdraws Claim Seven. ECF 36 at 21. It is dismissed as moot.

**CONCLUSION**

For the reasons described herein, Defendants' Motion for Partial Summary Judgment [filed October 29, 2021; ECF 33] is **denied without prejudice**. Defendants may file a second motion,

addressing only the issues raised in this Order, which the Court will consider as supplemental to the briefing already submitted. That second motion shall be filed no later than fourteen days from the date of this Order, and Plaintiff may file a response no later than twenty-one days after the filing of the second motion.

Additionally, Defendants' Motion to Dismiss [filed October 15, 2021; ECF 32] is **granted in part** and **denied in part**. It is denied as to Claim Three and granted (due to the mootness of the claims) as to Claims Four and Seven. The Court has reserved ruling on the motion as it relates to Claims One and Two pending supplemental briefing on exhaustion. Should the Court find the claims to be exhausted, Defendants shall be permitted to refile their Motion to Dismiss as to Claims One and Two. The Court will set a status conference by separate order at the appropriate time concerning how to move forward on Claim Three.

Entered and date this 7th day of March, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge