1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
      Case No. 21-cv-10-MEH
 3    _____

 4    DZHOKHAR TSARNAEV,

 5         Plaintiff,

 6    vs.

 7    FEDERAL BUREAU OF PRISONS,

 8         Defendant.

 9    _____

10            Proceedings before MICHAEL E. HEGARTY, United

11    States Magistrate Judge, United States District Court for

12    the District of Colorado, commencing at 3:02 p.m., May 25,

13    2022, in the United States Courthouse, Denver, Colorado.

14    _____

15            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17    _____

18                           APPEARANCES

19            DZHOKHAR TSARNAEV, appearing Pro Se.

20            SUSAN PROSE, Attorney at Law, appearing for the

21    Defendant.

22    _____

23                         MOTION HEARING

24

25
```

2

```
1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURT:  Good afternoon.  Please be seated.

6    Case Number 21-cv-10, Nev- -- excuse me, Dzhokhar Tsarnaev

7    vs. Merrick Garland and B. True.  Mr. Tsarnaev, just please

8    state your full name.

9              MR. TSARNAEV:  Yes, Dzhokhar Tsarnaev.

10             THE COURT:  Okay.  Can you hear me okay?

11             MR. TSARNAEV:  Yes, I can, Your Honor.

12             THE COURT:  Thank you.  And in the courtroom,

13   please.

14             MS. PROSE:  Good afternoon, Your Honor, to you and

15   Mr. Tsarnaev.  Susan Prose for the United States.  And with

16   me is Christopher Synvoll the supervisor attorney at the

17   Florence correctional complex.

18             THE COURT:  Thank you.  Any gold medals yet in the

19   Olympics?  Not yet?  Okay.

20             All right.  So I needed this because maybe I need

21   some interpretation of what was in the supplement.  What

22   I -- what I typically receive in a situation like this is

23   what actually happened with regard to the processing of a

24   claim.  All 23 paragraphs in the supplement tell me the

25   process generally.  Not a single one of those 23 paragraphs,
```

3

1    I believe, that says what actually was done in this case.  I

2    wonder if that's -- if there was an institutional

3    impediment, a confidentiality impediment, a national

4    security impediment for telling me how Mr. Tsarnaev's claim

5    was actually handled by human beings.  So --

6            MS. PROSE:  May I approach, Your Honor?

7            THE COURT:  Yes.

8            MS. PROSE:  So, Your Honor, we focused on telling

9    the Court what we can say with certainty.  What the process

10   is, that it is not a dead end, that inmates can and do

11   receive relief on a regular basis.

12           With regard to specifics, you know, it is very

13   difficult for us to completely recreate the process for

14   specific remedies with absolute certainty.  We can give you

15   a sense of what happened after a diligent search.  We cannot

16   find paperwork that definitively explains the process for

17   both of these remedies.  That said, Mr. Synvoll is here

18   today and he's going to provide you, if Your Honor wishes,

19   the additional information that we can definitively tell

20   you.

21           THE COURT:  Okay.  It's fair for me to explain

22   context to Mr. Tsarnaev.  I don't know whether I told you

23   this or not during my monitoring duties, Mr. Tsarnaev, but I

24   was an assistant United States attorney for 14 years.  The

25   Bureau of Prisons was actually my major client.  Mr. Synvoll

4

1    was actually my major client within the Bureau of Prisons,

2    and I did these things all the time.

3            And what I recall both as an assistant United

4    States attorney and as a judge since 2006 is uniformly being

5    told that at the BP8 -- did I get that number, right?

6            MS. PROSE:  Yes.

7            THE COURT:  -- it was denied by this person on

8    this day, BP9 this person on this day in Kansas City or

9    whatever, BP10 denied by this person on this day, and a BP11

10   by this person on this day.  And they have always been, in

11   my experience, very fastidious just in maintaining chain --

12   what I would call chain of custody of someone's -- someone's

13   grievances knowing that some day we might be in court

14   exactly as we are today wondering what those events were.

15           So I'm happy to receive whatever you want to offer

16   as far as Mr. Synvoll is concerned.

17           MS. PROSE:  And, Your Honor, the remedy package

18   that we have for the two relevant remedies on Mr. Tsarnaev's

19   grievance regarding the photographs and Mr. Tsarnaev's

20   grievance regarding the hobby craft items, those are

21   attached to -- to Ms. Trujillo's (ph) declaration in the

22   initial summary judgment.  That's the paperwork that we have

23   for these two remedies.

24           THE COURT:  Okay.

25           MS. PROSE:  And we provided that in the first --

5

1   in the first motion.  So -- but with all of that said,

2   Mr. Synvoll is here and I know he is very willing to answer

3   your questions.

4        THE COURT:  Right.  And so, yeah, I mean, I

5   tried -- maybe I didn't make -- pull out every single

6   question that I had and put it in my order, but, you know, I

7   wasn't just concerned about -- as you know, I just wasn't

8   concerned about who and when but what, when I quoted the

9   language saying the BOP doesn't have authority to modify

10   SAM, or when I quoted the third person language that it was

11   determined, it has been decided without attributing that to

12   anybody.  So those are the kind of things that I really

13   needed is who decided those things.

14        I mean, I'm not suspicious at the moment about

15   anything improper, but in writing any order that I write

16   some day that may be appealed to the Tenth Circuit, I just

17   need the most perfect record that I can possibly create at

18   the trial level.

19        MS. PROSE:  I understand, Your Honor.  So I can

20   certainly turn the podium over to Mr. Synvoll.

21        THE COURT:  Thank you.  And Mr. Tsarnaev, I take

22   it you won't object to him asking Mr. Synvoll some questions

23   because Mr. Synvoll is about to proffer evidence, correct?

24        MR. TSARNAEV:  No, no objection, Your Honor.

25        MS. PROSE:  I'm going to get the specific remedy

6

1   packets --

2           THE COURT:  Okay.

3           MS. PROSE:  -- for Mr. Synvoll.  I don't think he

4   brought those over with him, Your Honor.  It will take me

5   just a moment to find them.

6           COURTROOM DEPUTY:  And just a reminder to everyone

7   joining by telephone, if you were joining to listen in, make

8   sure your telephone is on mute, please.

9           MS. PROSE:  And Your Honor, just for the record

10  and so you know, I'm handing Mr. Synovll what we've labeled

11  as Attachment 8 in the initial motion for summary judgment,

12  and so that's ECF 33-1 beginning at page 80.

13          THE COURT:  Hold on.  Wait for a second.

14          MS. PROSE:  Okay.

15          THE COURT:  You said that's 80 of docket --

16          MS. PROSE:  It begins on page 80, Your Honor.

17  That's Attachment 8, Remedy Case 1002621.  Does that

18  correlate with what you have there, sir?

19          THE COURT:  Yeah.  (Indiscernible - mic not

20  picking up voice).

21          MS. PROSE:  8, yes.  This is the -- that's the

22  photograph remedy packet.  And then, Your Honor, the other

23  is --

24          THE COURT:  That would be what you would review as

25  your complete file on that --

7

1        MS. PROSE:  That is the file.  That is the file.

2   And, of course, as Your Honor knows, there is

3   cross-referencing into the administrative remedy index for

4   those rejections that are not maintained by the regional and

5   central offices, as I know Your Honor knows that.  So I can

6   also certainly pull that administrative remedy index.

7   That's an earlier -- that's provided as an earlier

8   attachment.

9        And then Attachment 9 is the remedy packet, the

10  documents that we have concerning Mr. Tsarnaev's hobby craft

11  remedy, and that begins at ECF 33-1, page 90.

12       THE COURT:  Great.  And Mr. Synvoll, if you

13  wouldn't mind then, since we're talking about a finite

14  number of pages, just proffer what each page means in the

15  process of the grievance working its way through the BOP.

16  Okay?

17       MR. SYNVOLL:  Yes, sir.

18       THE COURT:  In addition to whatever else you were

19  going to say, which I'm not going to limit what you're going

20  to say, but that would be helpful to me as you designate

21  each page and the stage at which that page was created.

22       MR. SYNVOLL:  Absolutely.  So if we begin with

23  what is I believe page 80 and then moves into page 81.  So

24  what -- page 81 is essentially the administrative remedy

25  that Mr. Tsarnaev made at the institution level -- or at the

8

1    regional level, pardon me.

2              THE COURT:  That's his first attempt to --

3              MR. SYNVOLL:  Yes.

4              THE COURT:  -- exhaust?  Okay.

5              MR. SYNVOLL:  Yeah.  And that's at the regional

6    level, which is pages 80 and 81.

7              THE COURT:  So there is no institution level form?

8              MR. SYNVOLL:  So we need to go back a little bit

9    further in the documents to find the -- the institutional

10   level form is at BP9.

11             THE COURT:  So it's in the same ten pages we're

12   about to look at?

13             MR. SYNVOLL:  Yes.

14             THE COURT:  Okay, good.  Is this reverse order

15   then or what?

16             MR. SYNVOLL:  Yeah.  It kind of goes in -- you

17   know, it starts out, if you want to, the central office,

18   regional office and then the institutional level, sir.

19             THE COURT:  This is the regional first?

20             MR. SYNVOLL:  Correct.

21             THE COURT:  Okay.

22             MR. SYNVOLL:  But if we -- if we want to go back

23   to where we begin with the --

24             THE COURT:  Why don't we do that.  Go ahead.

25             MR. SYNVOLL:  -- institution issue, I believe

9

1    that's pages 86 and 87, 88 and 89.  So that's -- you know,

2    so you begin, you know, on pages 86 is where you find that

3    BP8, that BP8 form, the attempt at informal resolution --

4             THE COURT:  Yes.

5             MR. SYNVOLL:  -- to begin with.  So, you know, the

6    response that's provided there is by Ms. Tuttoilmondo and

7    she's, you know, essentially explaining to them there that

8    at this informal level he's unable to resolve it at this

9    level.

10             THE COURT:  That's titled "Department's Response

11    Regarding Complaint" right within that page?

12             MR. SYNVOLL:  Yes, sir.

13             THE COURT:  Thank you.

14             MR. SYNVOLL:  All right.  And then with that, Mr.

15    Tsarnaev then has the opportunity to bring that to the

16    warden's attention if he's not satisfied with that response,

17    which I would expect he would not be given that -- given

18    that response.  So then you have what is the BP9 level where

19    they request for administrative relief at the warden's

20    level, which is page 84 and 85, it appears, and --

21             THE COURT:  You know, are you getting all these

22    pages?

23             MR. SYNVOLL:  I am not moving too fast?  Sorry.

24             THE COURT:  No, you're not.

25             MR. SYNVOLL:  Pages 84 and 85.  So what I will

10

1    explain with this process, with this one, it was received,

2    and my understanding from looking at page 83, is the

3    institution's response, which is that it was rejected as

4    untimely.

5            THE COURT:  So this is Mr. Tsarnaev's December 30,

6    2019?

7            MR. SYNVOLL:  Yes.

8            THE COURT:  Okay.  And then response is the next

9    page?

10           MR. SYNVOLL:  Yeah.  It looks like page 83, it

11   looks like, but page 83 is the institution response, which

12   says it's untimely.  So he submitted it too late is what

13   they're explaining to him, because from what I understand

14   from looking at this, Your Honor, is that they are -- he is

15   challenging a specific provision in his SAM when it was

16   implemented and he was given notice of it in August of 2019,

17   and he's now challenging that that language, that decision

18   to place that in there, the rationale for it, as far as the

19   photographs, and so they're letting him know in that

20   response that it's within 20 days.  And the person who does

21   that is the administrative remedy clerk at the institution.

22           THE COURT:  And so they -- the time deadline comes

23   from an administrative regulation or institutional level

24   regulation or what?

25           MR. SYNVOLL:  It comes from actually the Code of

1    Federal Regulations, which is also captured in our program

2    statement.

3            THE COURT:  Right.  And the CFR says what is the

4    timeframe, the time limit to submit it?

5            MR. SYNVOLL:  20 days from the date of occurrence

6    or the event that is the causing the --

7            THE COURT:  Okay.  And you're construing that to

8    be the issuance of the SAM or the receipt of the SAM?

9            MR. SYNVOLL:  The issuance or his -- more

10   importantly, his receipt notification that the special

11   administrative measures in his case had been extended for

12   another year and any changes that -- you know, any

13   additional provisions that language, that sort of thing.

14   Typically, that's a multipage document that sets out not

15   only the justification for it, but then also the specific

16   provisions.  There may be modifications both tightening up

17   as well as --

18           THE COURT:  In fact, you have modified since that

19   time his SAMs, from what I understand?

20           MR. SYNVOLL:  I believe so, yes.

21           THE COURT:  I think you preferred that --

22           MR. SYNVOLL:  Okay.

23           THE COURT:  -- that he was given -- or else he was

24   given some relief on one of his grievances, I don't know,

25   but he has had a change in his circumstances I understood

1    that you proffered to me in one of the motions.  Anyway, so

2    that's 20 days.  And what was the date of his receipt of the

3    SAMs?

4            MR. SYNVOLL:  So we have to look back at what he

5    attached, but it's going to be on or around August 27.  It

6    might have even been a few days after that.  That is the

7    date that the notification is created and began routing.  So

8    I don't have the actual signature sheet of his special

9    administrative measures, but we do attempt to obtain a

10   signature.  Or if Mr. Tsarnaev had refused to sign the

11   receipt of it, we would note (indiscernible - audio broke

12   up) the date that that occurred.

13           So August, early September, but I don't have that

14   date, sir, based on the documents that I have.

15           MR. TSARNAEV:  Your Honor, I can just --

16           THE COURT:  Go ahead.

17           MR. TSARNAEV:  Real briefly.  When they -- they do

18   the SAM's, I don't get a copy of the SAM's until maybe two

19   or three weeks later.  So it wasn't late August or early

20   September.  It might have been mid to late September that I

21   actually get a copy of the SAM's itself.

22           THE COURT:  Okay.  And part of what I'm doing is

23   simply explaining an existing record.  I'm not trying to

24   create a new record at the moment.  So I believe or assume

25   that you would have put that into one of your documents

1   submitted to the court already, Mr. Tsarnaev; is that

2   correct?

3             MR. TSARNAEV:  Which -- where?

4             THE COURT:  Yeah.  What you just told me, have you

5   already told me that in writing with something you submitted

6   to the court?

7             MR. TSARNAEV:  No, I don't think so.

8             THE COURT:  You don't think so?

9             MR. TSARNAEV:  When I filed the initial remedy, I

10  assumed that I received the SAM's.  Whenever I filed it,

11  that's when I informed them that, you know, this never

12  happened, you need to remove it.  And that's when they told

13  me, oh, this is 20 days, this is more than 20 days, which

14  wasn't true.

15            THE COURT:  Well, so --

16            MS. PROSE:  Your Honor, if I may.

17            THE COURT:  Ms. Prose, yeah, why don't you --

18            MS. PROSE:  It may be in the -- I would presume if

19  Mr. Tsarnaev perceived there to be a mistake, believed there

20  to be a mistake, he would have written that into the

21  regional appeal then.  He would have brought that to the

22  attention at the next level.  So that's where it may be

23  here.

24            THE COURT:  Okay.

25            MS. PROSE:  I don't have it right in front of me.

14

1            THE COURT:  Okay.  Well, I think your argument

2    would be that that's where he had to do it necessarily if he

3    had a basis for believing.

4            MS. PROSE:  Well, yes, Your Honor, indeed.

5            THE COURT:  Okay.  All right.

6            MR. TSARNAEV:  From my understanding, Your Honor,

7    is that they suggested it on the basis that the offends

8    happened -- that the SAM's was -- the offense was maybe more

9    than 20 days because that means that the photographs were

10   from a year ago, not from the (indiscernible) being

11   delivered to me and then after that 20-day period -- sorry,

12   do you understand what I meant?

13           THE COURT:  Well, yeah.  It's a little bit

14   difficult to hear you.  Does the facility -- I don't know if

15   it will ever come up in the future, but it might.  How is

16   the facility's video equipment, and is that an -- is that an

17   institutional problem for having somebody like Mr. Tsarnaev

18   on a video call?

19           MR. SYNVOLL:  No, it's not.

20           THE COURT:  It was my fault for not setting it up

21   like that.

22           MR. SYNVOLL:  Just so long -- you know, that would

23   be also a discussion that we would want to have with our

24   other federal partners, just given the --

25           THE COURT:  Understood.

1          MR. SYNVOLL:  Okay.

2          THE COURT:  And I should have given you -- I

3    should have asked for it.

4          MR. SYNVOLL:  But we do have video conferencing

5    capabilities, Your Honor, yes.

6          THE COURT:  So Mr. Tsarnaev, we may have a few of

7    these arise during what we're about to do, but the

8    question -- not the question, the issue that was just

9    discussed is that your SAMs were dated, Mr. Synvoll?

10          MR. SYNVOLL:  The notice that was prepared and

11    routed for signature is dated August 27, 2019.

12          THE COURT:  Okay.  So what he just said, did you

13    hear that, Mr. Tsarnaev?

14          MR. TSARNAEV:  Something was routed August 27.

15    What was routed?

16          THE COURT:  No.  August 27, what was created,

17    Mr. Synvoll?

18          MR. SYNVOLL:  So it was the notification of

19    extension of Special Administrative Measures with respect to

20    Mr. Tsarnaev and it's dated August 27, 2019.  That is the --

21    he attached specific pages of that to his BP8 as well as

22    BP9, I believe.

23          THE COURT:  Right.  And does the record you

24    submitted to me have any documentation of his receipt of

25    that?

16

1          MR. SYNVOLL:  No, it does not, sir.

2          THE COURT:  Okay.  And so Mr. Tsarnaev,

3   Mr. Synvoll has proffered that within the institution or

4   within the Bureau of Prisons, that kind of notification is

5   physically given to you within two weeks, is what you just

6   said; is that right, Mr. Synvoll?

7          MR. SYNVOLL:  Approximately, yes.

8          THE COURT:  Approximately two weeks.  So if you

9   don't think that's true, you need to clearly state, because

10  two weeks from August 27 would be about no later than

11  September -- I'm not going to say that -- September 12,

12  okay.  I won't use the 11th.  So about September 12, okay?

13          So if you disagree with that, you need to tell me

14  right now.

15          MR. TSARNAEV:  Yes, I disagree with that, yeah.

16          THE COURT:  All right.  I don't know what I'll do

17  with this, but any objection, Ms. Prose, with me putting

18  Mr. Tsarnaev under oath in responding to the Court's

19  questions?

20          MS. PROSE:  No, sir.

21          THE COURT:  Mr.  Tsarnaev, will you please raise

22  your right hand.

23          MR. TSARNAEV:  Okay.

24                  DZHOKHAR TSARNAEV,

25  having been first duly sworn, was examined and testified as

1   follows:

2            MR. TSARNAEV:  I do.

3            THE COURT:  Okay.  So I want you to state clearly

4   when you believed you received notice that your SAMs were

5   extended.

6            MR. TSARNAEV:  Your Honor, like I said, I -- I

7   know that he extended the one thing, but to actually receive

8   copy of the SAMs and to know what is in it, that's another

9   matter, yes.

10           THE COURT:  Well --

11           MR. TSARNAEV:  What I'm saying is I received it

12   possibly mid- -- mid-September -- possibly maybe September

13   20 or around that time.

14           THE COURT:  Well, that's not a fundamentally

15   different time than what we're talking about.  You said

16   mid-September, S-E-P-T-E-M-B-E-R, around September 20?

17           MR. TSARNAEV:  Yeah, yeah, mid-September to -- I

18   mean, around the 15th or 20 -- or early 20.

19           THE COURT:  Okay.  And then Mr. Synvoll, the date

20   of the first attempt at exhausting was what?

21           MR. SYNVOLL:  So he submitted his -- attempt at

22   informal resolution, which is the BP8, which is page 86.

23   His signature is dated December 16, 2019.

24           THE COURT:  Okay.  And I take it that that first

25   response by whoever it was --

1           MR. SYNVOLL:  Ms. Tuttoilmondo.

2           THE COURT:  Ms. Tuttoilmondo, she does not have

3    the authority to say this is untimely.  Would that be

4    correct?

5           MR. SYNVOLL:  Correct.

6           THE COURT:  All right.

7           MR. SYNVOLL:  She's going -- you know, that's

8    effort at -- it's an attempt at an informal resolution.

9           THE COURT:  Okay.  And at the next level, which is

10   the warden level, he did say it was untimely?

11          MR. SYNVOLL:  Correct.  This is an administrative

12   remedy clerk specifically who did that.  So that

13   administrative remedy clerk will get that, take a look at

14   the dates and then prepare the necessary rejection.  And it

15   will be reviewed by the administrative remedy coordinator

16   who is at the ADX, is the executive assistant.

17          THE COURT:  And do you cite -- in your paperwork,

18   Ms. Prose, do you cite the specific CFR we're talking about

19   as far as timely filing?

20          MS. PROSE:  Your Honor, I don't believe we

21   addressed whether that -- whether that was properly or

22   correctly rejected.  I think that what we said there was

23   here is the process that was followed and, I, of course, am

24   prepared to make an argument on if there was a mistake and

25   the legal implications of that which do not absolve an

1  inmate of the obligation to exhaust, but I'll hold that for

2  later.

3          THE COURT:  Okay.

4          MS. PROSE:  But I do not believe that I would have

5  taken up the issue of whether or not it was -- it was or was

6  not timely.  I don't believe I would have had cause to do

7  that.

8          THE COURT:  Okay.  So remind me, I mean, I handle

9  300 cases.  Was a denial in this case based at least in part

10  on timeliness?

11          MS. PROSE:  At the institution level, Your Honor,

12  that's right.  And as Mr. Synvoll, I believe, will further

13  explain to you, the remedy there, because of the decision

14  made that it was not timely, was not even forwarded to the

15  legal office.  Ms. Trujillo (ph) explained this in her

16  declaration as well.

17          THE COURT:  Okay, very good.

18          MS. PROSE:  So the next level -- it went to the

19  region after that.  It was not addressed on the merits by

20  the legal department at the ADX because it never got to

21  them.  It was rejected as untimely.  It went back to

22  Mr. Tsarnaev.  That's how that worked.

23          THE COURT:  Okay.  So finish up then, Mr. Synvoll,

24  with regard to this.

25          MR. SYNVOLL:  With respect to this one, as we're

1   looking on page 83, he received notification that it had

2   been rejected as untimely.  He can appeal that decision to

3   the regional director's office, you know, if he disagrees

4   with it being rejected.  He did file a -- what is called a

5   BP10 with respect to that issue, and that's on page 81, and

6   then also see page 82, which is the regional director's

7   response.

8           THE COURT:  Yes.

9           MR. SYNVOLL:  And in there he does mention that

10  his administrative remedy was rejected, so he's continuing

11  his appeal.  And then, you know, the administrative claim is

12  at my request, it's in there, Your Honor, so you can take a

13  look at it.  The regional office, as you look at the

14  response, actually attempted to respond on the merits of

15  actually what Mr. Tsarnaev's challenge was or complaint was,

16  which is the -- the issue with the photographs, and that was

17  done by, it looks like -- I can't make out that signature.

18  Either that is Mr. Krueger's (ph), the regional director's

19  signature, or somebody signed for him.  I can't make out if

20  that's actually Mr. Krueger's signature.

21          THE COURT:  But it's his responsibility and he's

22  going to be viewed by the Court as the signator?

23          MR. SYNVOLL:  Correct.

24          THE COURT:  Okay.  And --

25          MR. SYNVOLL:  And that was on March 4, 2020.

1          THE COURT:  Does that act as a waiver of a

2    timeliness argument then if the regional level decides to go

3    ahead and decide on the merits and not address timeliness

4    issues?

5          MS. PROSE:  Your Honor, I don't know if it's a

6    waiver so much as it's responding to him.  May I take a

7    quick look at it --

8          THE COURT:  You may.

9          MS. PROSE:  -- because I don't have it memorized.

10          THE COURT:  But just keep in mind since recent

11    supreme Court cases --

12          MS. PROSE:  I understand, Your Honor.

13          THE COURT:  -- it can -- timeliness can be waived.

14          MS. PROSE:  Yes.  So my view in response to your

15    precise question, Your Honor, is that the regional director

16    did not address the timeliness issue.  The regional director

17    sought to address the substance of Mr. Tsarnaev's claim and

18    provided that response.  Is that a waiver of the timeliness

19    argument?  It may be.  I have not examined that case

20    recently.

21          THE COURT:  That's fine.  I'm not going to put you

22    you on the spot because --

23          MS. PROSE:  But, yes, Your Honor -- Your Honor

24    could be right.  But regardless at this point we have a

25    merits response, no doubt about it --

1          THE COURT:  Okay.

2          MS. PROSE:  No doubt about it.

3          THE COURT:  From there, Mr. Synvoll?

4          MR. SYNVOLL:  Excuse me, sir?

5          THE COURT:  Was that the end of that one?

6          MR. SYNVOLL:  Yes, sir.

7          THE COURT:  Okay.  And is that the highest level

8     of --

9          MR. SYNVOLL:  Well, then so he -- Mr. Tsarnaev

10    appealed to the -- my understanding --

11         MS. PROSE:  Yes.

12         MR. SYNVOLL:  He did appeal to the -- pardon me.

13    He did appeal that decision to the central office.  And do

14    we have the administrative remedy index?

15         MS. PROSE:  We do.

16         MR. SYNVOLL:  Okay.  It's my understanding he

17    appealed that decision or that decision by Mr. Krueger to

18    the central office, the national inmate appeals coordinator,

19    and they did reject that because -- based on a procedural

20    issue, which he had failed to attach the appropriate number

21    of copies.

22         THE COURT:  And is that decision provided to me in

23    writing?

24         MS. PROSE:  Yes, it is.  It's in Ms. Trujillo's

25    declaration, sir.

1      THE COURT:  And which is what now?

2      MS. PROSE:  That is going to be -- that is ECF

3  33-1 and -- I apologize, I believe we're speaking about the

4  photograph (indiscernible) right now, sir, if I'm not

5  mistaken, and she addresses -- she addresses these questions

6  you're asking Mr. Synvoll, sir, on pages 7 and 8 of that

7  PDF, of that 33-1.

8      And so specifically with regard to what happened

9  at the central office level, it was returned to Mr. Tsarnaev

10  with a notification of the grounds for rejection and a

11  notification that he could resubmit it.  And we reference

12  for you there simply the Century Administrative Remedy

13  Index, because they do not maintain those particular

14  rejections.

15      THE COURT:  Okay.  So all that paragraphs 7 and 8

16  say is a process?  It doesn't say what happened with

17  Mr. Tsarnaev; is that correct?

18      MS. PROSE:  Excuse me, Your Honor.  It's

19  paragraphs beginning at 18, sir.

20      THE COURT:  Oh, I thought you said --

21      MS. PROSE:  I apologize if I misspoke.  It's on --

22  it begins on page 7, Your Honor.  This is the discussion of

23  these documents and what the paper record shows regarding

24  Mr. Tsarnaev's photograph remedy, ECF pages 7 and 8, and

25  specifically, sir, paragraphs 18 through 22.  That's the

1  photograph remedy explanation of the paperwork that's been

2  maintained.

3          THE COURT:  So that's the only record I have is

4  her affidavit, because she says --

5          MS. PROSE:  And the papers themselves, of course.

6          THE COURT:  Right, no, but she says the central

7  office does not retain copies of rejected appeals.

8          MS. PROSE:  Yes, that's right.  She is telling you

9  when that happened -- she is telling you that it was

10  rejected at the central office, although she can see that

11  when she correlates that back with the Administrative Remedy

12  Index.

13          THE COURT:  Right.

14          MS. PROSE:  And that's what she can say because

15  they don't retain those specific rejections.  I -- and, Your

16  Honor, if I may you, and Mr. Tsarnaev can speak to this

17  better than me, but I don't believe Mr. Tsarnaev has denied

18  that he (indiscernible - audio broke up) rejection notice

19  here.

20          THE COURT:  That's final.  Do you confirm, Mr.

21  Tsarnaev, that sometime in May of 2020 you got a rejection

22  notice?

23          MR. TSARNAEV:  I did get a rejection.  I cannot

24  confirm if it was May.  I don't have the --

25          THE COURT:  Okay.

1          MR. TSARNAEV:  -- remedy in front of me.

2          MR. SYNVOLL:  And I -- I also -- I just want to

3    make it clear, I believe Mr. Tsarnaev's position is that

4    when he got that rejection notice it was well beyond the 15

5    days that they identified in that notice for him to correct

6    the procedural deficiencies.

7          THE COURT:  Okay.

8          MR. SYNVOLL:  Which I -- I have no reason to

9    doubt.  As my understanding of the process is, those

10   remedies or those remedies as well as rejections are

11   returned to the various institutions through batch mail.

12         THE COURT:  Okay.

13         MR. SYNVOLL:  Okay.  So it takes -- it typically

14   comes back late, and we routinely at the institution -- or

15   institutions out of Florence we're routinely issuing memos

16   when the inmates raise that issue and they want to cure the

17   deficiency, provide them with a memo identifying the date

18   that they got it so that they cure that deficiency and move

19   forward.

20         THE COURT:  Okay.  So Mr. Tsarnaev whenever you

21   got that in May, or whenever you got the rejection, was that

22   the end of your efforts at exhausting?

23         MR. TSARNAEV:  Yes.  Yes, it was.

24         THE COURT:  Thank you.  All right.  Are we ready

25   to move on to the next one?

1          MR. SYNVOLL:  Yes, sir.

2          THE COURT:  Go ahead.

3          MR. SYNVOLL:  Yes, Your Honor, pardon me.  So the

4     next one is -- that we're dealing with is the hobby craft.

5     Hobby -- his challenge of the hobby craft materials.  And it

6     looks like these are in chronological order for Attachment

7     9, which begins on page 90 of Document 33-1.  So you'll

8     begin to see again Mr. Tsarnaev's attempt to resolve this

9     informally at the institution level, right basics with

10    members of his unit teams, et cetera.  And he was provided a

11    response by -- on November 22, 2019.  And that looks like it

12    might be Mr. Holbrook's signature, the counselor.

13          Then on December -- and then he challenged that to

14    the institutional, which is found on page 93.  So just to

15    make sure we're clear on the record, his BP8 or the

16    attempted informal resolution appears to be pages 91 and 92.

17    Then we see the BP9 or his request for administrative remedy

18    at the institutional level at page 39.

19          THE COURT:  It's called a BP229, but they just

20    dropped the 22?

21          MR. SYNVOLL:  Yes, sir.  And there, when you get

22    to pages 93, 94, when you get to page 95, you do see that

23    there was a substantive response provided by the warden at

24    the institution.  And if I can make clear as far as how this

25    process occurs, when these remedies are accepted by the

1   administrative remedy clerk and entered into Century, they

2   are then assigned to the various departments or apartment

3   heads for investigation and drafting of a response.

4          These type of remedies are all assigned to the

5   office that I oversee, the legal services department at the

6   institution, and then one specific attorney in our office

7   deals with these issues and helps coordinate the preparation

8   of a response.  Typically -- because we partner with other

9   federal agencies on these issues and the management of the

10  inmates that -- or individuals that have special

11  administrative measures.  So we have to begin to reach out

12  to these other federal partners.  And they vary by inmate

13  because not every inmate is prosecuted by the same United

14  States Attorney's Office, monitored by the same law

15  enforcement agency, et cetera.

16         So in this instance, we reached out to the

17  attorney in our office, reached out to the United States

18  Attorney's Office in the District of Massachusetts

19  specifically and assisting the United States attorney, as

20  well as individuals on the National Joint Terrorism Task

21  Force, as well as an individual in the Office of Enforcement

22  Operations to let them know, one -- and they're provided the

23  BP9 and Mr. Tsarnaev's issues and concerns.

24         And then we get their feedback and we get their

25  decision.  Typically it's a collective decision that OEO

1    then essentially decides based on input and feedback from

2    the United States Attorney's Office, as well as the law

3    enforcement agency.

4              THE COURT:  So the specifics I need to know

5    here -- and again, since you're an attorney, I'm not going

6    to put you under oath, but you know that you have the duty

7    of candor to the court --

8              MR. SYNVOLL:  Yes, sir.

9              THE COURT:  -- is that each of those three offices

10   did actually consider this one thing?

11             MR. SYNVOLL:  Yes, sir.

12             THE COURT:  Each of them made a communication to

13   OEO?

14             MR. SYNVOLL:  As well as to -- to each other as

15   well as us, and, you know, we're all part of that group.

16             THE COURT:  Okay.  And those are in writing, oral?

17   Does it make any difference?

18             MR. SYNVOLL:  Most likely it would have been -- it

19   can occur in a number of different ways, Your Honor.  It

20   could be on the phone or it could be in e-mail.

21             If there is -- what I see generally in my

22   experience is if there is going to be a modification made --

23   in other words, they say yes, this is -- make the change,

24   that is all done in writing, historically.

25             Many times, though, if they disagree with the

1    individual's position who is challenging a provision under

2    SAM, we don't get -- it's a phone call conversation.

3    They're calling us up and explaining things to us over the

4    phone.

5              THE COURT:  So in this situation, then, the BOP

6    acts only as a passthrough for decision made by somebody

7    else, specifically those three entities?

8              MR. SYNVOLL:  Well, I hate to say that we're just

9    a passthrough because there are discussions -- not

10   necessarily maybe taking a position regarding it, but we do

11   provide information for us -- the hobby craft program,

12   inmate's access to hobby program and having it being

13   meaningful to them is a value to us --

14             THE COURT:  Right, of course.

15             MR. SYNVOLL:  -- as well as the inmate, because we

16   have an obligation to provide a life-enhancing meaningful

17   program to these guys.  So we are -- we are going to explain

18   how this program operates, what sort of options there may be

19   to maybe address some of the issues that Mr. Tsarnaev makes,

20   and then a decision is made.

21             THE COURT:  But if appropriate actually give an

22   opinion about which way it should go?

23             MR. SYNVOLL:  Yes.

24             THE COURT:  Okay.

25             MR. SYNVOLL:  Yes.  So at that point --

1          THE COURT:  The confusing part for me was the next

2   sentence.  He said:  These three offices looked at it.  We

3   don't have authority to modify it.

4          There is an implication there that we just told

5   them stuff and they told us back stuff, but now you've

6   provided context that I didn't have before.

7          MR. SYNVOLL:  And that's (indiscernible) -- that's

8   poorly drafted language and we are not using that language

9   moving forward.

10         THE COURT:  Right.  And because the sentence

11  actually says any modifications requires analysis, but you

12  already just said --

13         MR. SYNVOLL:  We did.

14         THE COURT:  -- that you would include in the

15  analysis approval and concurrence from US, AO, DMA, FBI and

16  OEO with BOP not mentioned at all in that sentence.

17         MR. SYNVOLL:  Okay.  Based -- what I can present

18  to you is based on my conversation with the attorney that

19  was involved in that process, what I just presented to you

20  is what occurred.

21         THE COURT:  Very good.

22         MR. SYNVOLL:  So based on that -- and we

23  recognize, Your Honor, that last paragraph is probably clear

24  as mud is exactly what the process was, what the decision

25  was, et cetera.  So we are -- we'll make sure that it is

31

1    clear.  In fact, we are making it clear as we move forward,

2    but that was signed by Warden True on January 7, 2020.

3            THE COURT:  Very good.

4            MR. SYNVOLL:  Yes.  Mr. Tsarnaev then challenged,

5    or I shouldn't say challenged, but was not satisfied with

6    that decision, so he raised it to the regional director in

7    Kansas City, or in the north central regional office, who

8    they get -- they then review.  A similar process occurs for

9    them or should be occurring.

10           I -- as our office reached out to the individuals

11   that were involved in reviewing this response, it didn't

12   stand out to them, they didn't have notes of any of those

13   conversations or discussions that they would have had, but a

14   similar process occurs, Your Honor.  They're dialoguing with

15   the attorney on my staff at the institution, they are then

16   also reaching out to the various entities.  Because one

17   thing that I will say is these issues and these discussions

18   are very much fluid.  They can change from day to day, week

19   to week, month to month, moment to moment, because new

20   information is coming in.

21           And just because at the institution level the

22   initial decision was, no, we can -- again, we continue to

23   have dialogues with them and discuss through options that

24   are available, because as I explained, we have a role

25   incentive here to make a program meaningful to the

1    individual or the inmates there that are in our custody and

2    care.

3           So while I cannot present to you documents,

4    e-mails or anything else like that, all I know is what is

5    there.  And I have reaffirmed the obligations with the folks

6    in our regional office as well as our regional counsel is

7    going to make sure that those sorts of things are occurring

8    and continuing to occur, that that dialogue occurs with the

9    other federal partners at that level.

10          We have a new regional counsel, Ms. Mary Noland

11   (ph), who ensures me that that is going to be addressed.

12   And they have an attorney who was on my staff who is now in

13   the regional counsel's office that will be ensuring that

14   occurs at that level.

15          THE COURT:  So I think what you're saying is at

16   the regional response level in Kansas City, the same three

17   entities in consultation with the Bureau of Prisons would

18   have had input into the regional decision even though that

19   document doesn't say that?

20          MR. SYNVOLL:  Correct.  And it would appear that

21   the regional documents continue on from pages 96, 97, 98, 99

22   and 100 and 103.  It's my understanding through the review

23   of Ms. Trujillo's declaration as well, as well as a review

24   of the Administrative Remedy Index that was attached to her

25   declaration, that he did challenge that or raised that to

1    the central office level, the national inmate's

2    (indiscernible - audio cut out) coordinator, and at that

3    level it was again rejected similar to the last one, again

4    for a procedural issue.  Again, he didn't attach the

5    appropriate number of pages.

6           THE COURT:  Do we have his -- is it BP11?

7           MR. SYNVOLL:  Yes, that is the BP11

8    (indiscernible), Your Honor, yes.

9           THE COURT:  Is it in the record?

10          MR. SYNVOLL:  We do not have that.  What I have is

11   in Trujillo's declaration, which is a copy of the

12   Administrative Remedy Index from Century, which gives us --

13   because if it was rejected, they didn't maintain any of

14   those documents.  The central office does not do that.  And

15   it was rejected back to the inmate.

16          THE COURT:  I thought we had the 11.

17          MR. SYNVOLL:  We did not.  All we have is the

18   Administrative Remedy Index --

19          MS. PROSE:  Not if it is rejected, Your Honor,  we

20   don't have that.  Mr. Tsarnaev very well may have a copy of

21   that.  We do not.

22          THE COURT:  So 11 is never maintained?

23          MR. SYNVOLL:  If it's rejected.

24          THE COURT:  If it's rejected.  No matter what the

25   grounds are?

1            MR. SYNVOLL:  Correct.

2            THE COURT:  Even if it's -- if it's timeliness,

3    procedural or substantive, 11 is not rejected?

4            MR. SYNVOLL:  If it's rejected -- if they're going

5    to reject it, it's going to be on a procedural issue, either

6    due to timeliness or failed to attach some sort of document,

7    that sort of thing.  They're not going to maintain --

8            (Muffled noise.)

9            MS. PROSE:  Your Honor, I don't think that's at

10   the institution.  I think that's a listener who doesn't have

11   their phone on mute.

12           THE COURT:  So we're going to drop the public line

13   if whoever is on it doesn't mute their phone.  Probably

14   can't drop it, can we, because Mr. Tsarnaev called on a

15   public line?  All right.  Listeners need to be quiet,

16   please.  Would you see how many people are on, please, at

17   least.

18           OPERATOR:  There are ten participants on the call,

19   including you.

20           THE COURT:  Okay.

21           UNIDENTIFIED SPEAKER:  (Indiscernible).

22           THE COURT:  Well, no, no.  Mr. Synovll doesn't

23   have the authority to just on the spur of the moment let him

24   be on video.  I think that's what he said.

25           UNIDENTIFIED SPEAKER:  (Indiscernible).

1          THE COURT:  Oh, telephone line through the video,

2     okay.  All right, all right.

3          So anyway, a rejection is not a denial.

4     Rejections are for either procedural or timeliness.  Denial

5     is the merits.  And you're saying rejections are not

6     maintained, but denials are.

7          MS. PROSE:  Yes, that's right, and I'll let

8     Mr. Synvoll affirm that.  But, Your Honor, it's at the

9     regional and central office levels where those rejections

10    aren't retained.

11         We actually do so here at the institution level in

12    Florence.

13         THE COURT:  So have we finished the exhaustion

14    process for both of the claims (indiscernible - voice

15    dropped)?

16         MR. SYNVOLL:  Yes, for those two, for the lobby

17    craft and for the photographs.  And what I will say, Your

18    Honor, is again, these are fluid conversations.  As an

19    example of these two, these are still ongoing conversations

20    that our office, my office are having with our other federal

21    partners, not just with respect to Mr. Tsarnaev, but other

22    individuals regarding photographs and hobby craft, because

23    those are -- those are programs that we want inmates

24    participating in.  The photograph is actually an incentive

25    for participation in certain programs, so we're working with

1    our federal partners.

2           And so again, there is the opportunity always

3    through this process to see things change (indiscernible -

4    audio broke up).

5           THE COURT:  Right, but I think to summarize what I

6    think your position is, it is a significant, I guess, vague

7    and probably misstatement to say the BOP cannot modify your

8    SAMs.  The correct statement would be the three offices that

9    have primary responsibility in conjunction with the BOP that

10   has custody can modify your SAMs.  Is that the accurate

11   statement?

12          MR. SYNVOLL:  That's more accurate than what was

13   placed in that --

14          THE COURT:  Okay.

15          MR. SYNVOLL:  -- that administrative remedy, yes,

16   sir.

17          THE COURT:  Because I think I cited language from

18   some other cases where the BOP had submitted a statement

19   saying the BOP can't modify your SAMs.  And you can see from

20   a person like an inmate's perspective, that does sound

21   futile to give grievance to somebody who can't do anything

22   about it.  But -- so I think that's why it was a misleading

23   comment to say at that the BOP can't do anything.

24          MR. SYNVOLL:  I would agree that it was not

25   artfully corrected.

1          MS. PROSE:  Your Honor, may I add one thing just

2     for the record?  To follow up on what Mr. Synovll testified

3     concerning the hobby craft remedy, for reference, that's

4     Ms. Trujillo's declaration, ECF 33-1, paragraphs 23 through

5     37, address that remedy.  Thank you.

6          MR. TSARNAEV:  Your Honor, (indiscernible - audio

7     broke up) they are now changing the language.  That language

8     had an influence on me, just like it says.  (Indiscernible -

9     audio broke up).

10          THE COURT:  Hold on, Mr. Tsarnaev -- Mr. Tsarnaev,

11     we are going to have you call in to the video line because I

12     need to be able to hear you.  This is maybe the single

13     opportunity you're going to have to make a court appearance

14     in case, and so it needs to be effective.

15          So how do we do that?  And the telephone

16     participants will be able to hear this as well, correct?

17          UNIDENTIFIED SPEAKER:  (Indiscernible).

18          THE COURT:  Okay, very good.

19          (Pause in the proceedings.)

20          THE COURT:  You need to send an e-mail

21     (indiscernible).  It's just like an activity really for

22     attorneys in our courthouse.

23          (Pause in the proceedings.)

24          OPERATOR:  Welcome to a Cisco meeting.  You are

25     entering the meeting now.

1          (Pause in the proceedings.)

2          COURTROOM DEPUTY:  Mr. Tsarnaev, is there an FDC

3    officer right there with you that we could speak to on the

4    phone real quick?

5          MR. TSARNAEV:  Hold on.

6          COURTROOM DEPUTY:  Thank you.  Hello?

7          MR. TSARNAEV:  Yeah, one second.  Can you

8    (indiscernible)?

9          PAULA:  Hello?

10          COURTROOM DEPUTY:  Hi.  Is this Paula?

11          PAULA:  Yes.

12          COURTROOM DEPUTY:  We're going to ask you if it's

13    okay to call into a different phone number.  Is there a --

14    is there an e-mail we could reach her at?  Is there a --

15          THE COURT:  Give her a number.

16          COURTROOM DEPUTY:  Are you ready to take down the

17    number?

18          PAULA:  Hold on.  Let me get a pen and a paper.

19          COURTROOM DEPUTY:  Not a problem.

20          PAULA:  Okay.  What number?

21          COURTROOM DEPUTY:  The number is going to be

22    571-353-2301 and the code will be 649676724.

23          PAULA:  Okay.

24          COURTROOM DEPUTY:  Thank you very much.

25          PAULA:  I will give that one a try.

1            COURTROOM DEPUTY:  Thank you.

2            (Pause in the proceedings.)

3            OPERATOR:  All participants are now in listen only

4    mode.

5            (Pause in the proceedings.)

6            THE COURT:  You didn't have to press pound or

7    anything like that?

8            COURTROOM DEPUTY:  No.  This is so we get the

9    (indiscernible).

10           THE COURT:  Yeah, I know, but it's just entering

11   numbers.  Would it just say enter your access code now?  Is

12   that what it asks you to do?

13           COURTROOM DEPUTY:  Yeah.

14           THE COURT:  Of course, you can feel free to -- do

15   you have Trujillo's, is that Ms. Trujillo who is on the --

16   do you have her cellphone or anything?  You can feel free to

17   text her, see if she's going --

18           COURTROOM DEPUTY:  (Indiscernible).

19           THE COURT:  Oh, okay, that's fine.

20           (Pause in the proceedings.)

21           OPERATOR:  All participants are now in indirect

22   account mode.

23           COURTROOM DEPUTY:  And Mr. Tsarnaev, are you

24   there, or do we have anybody from Florence on the line?

25           THE COURT:  I take it we can't initiate the call?

1   They have to initiate it?

2          COURTROOM DEPUTY:  I don't believe so, Judge.  Let

3   me see.  Not by phone.  When they join, it will be a

4   different beep.

5          (Pause in the proceedings.)

6          THE COURT:  That's it, isn't it?  Mr. Tsarnaev.

7          PAULA:  Hold on.  I'll hand the phone back to him.

8          THE COURT:  Thank you.

9          OPERATOR:  All participants are now in listen only

10  mode.

11         MR. TSARNAEV:  Hello?

12         THE COURT:  Yes.  Mr. Tsarnaev?

13         MR. TSARNAEV:  Yes, Your Honor.

14         THE COURT:  Okay.  Speak as loudly as you can,

15  we'll give this a try.  Go ahead and say what you were

16  saying, please.

17         MR. TSARNAEV:  I was just saying that, Your Honor,

18  this language that they admit was problematic and vague had

19  a profound influence on me.  It kept me from exhausting the

20  remedies, especially in light of Ross.  (Indiscernible) Ross

21  challenge on.  And I believe that if this Court was to -- if

22  this Court denies the administrative remedies, that the

23  administrative remedies need to be exhausted

24  unconditionally, then nobody would be able to fight Ross or

25  produce the Ross by challenge.

41

1         So if the language is honored then what it was,

2    then perhaps I would have taken the efforts to exhaust the

3    remedies, Your Honor, (indiscernible - voice dropped).

4         THE COURT:  Well, tell me -- tell me what you

5    believe -- what action do you believe the Bureau of Prisons

6    did that misled you or interfered with your ability to

7    exhaust and why did it do that?  Just go ahead and put that

8    on the record.

9         MR. TSARNAEV:  Okay.  It was my belief that the

10   Bureau of Prisons sent my -- my request for relief to the

11   DOJ unit in charge of producing and modify the SAMs and

12   those -- those units simply responded in the most simplistic

13   way to say that (indiscernible) SAMs implemented and the

14   Bureau of Prisons just doesn't show implementing the SAMs,

15   right?

16        And I believe that this is what they were doing at

17   every single level.  And I call this the final agency

18   action, Your Honor, because they did not make it clear to me

19   at every level that they forwarded my complaint to the DOJ,

20   right?  The warden in the clear responsible language, in the

21   response to my BP9, made clear that he forwarded

22   my complaint.  The response was that I would not receive any

23   relief and that the BOP is unable to provide relief.

24        Now, the following -- I believe my following

25   request to the regional office, it did not mention in any

1    kind of language that they too forwarded that same request

2    to the DOJ, you understand, so I figured based on the

3    response that the warden got from the DOJ, based on the

4    SAMs, based on the restrictions, that the restriction would

5    abide, Your Honor.  And I figured they would do the exact

6    same thing as the central office.

7            So this is -- this is my understanding of what the

8    language proposed, Your Honor.  Yeah, and I figured this is

9    a dead end and I would be unable to attain relief, but I

10   would be able to fight Ross in my arguments to prove that

11   the DOJ made their decision and that the BOP could not

12   decide the termination, and that's really it, right?

13           Then I would seek your arbitration in the end.

14           THE COURT:  Understood.  Was there -- just -- it

15   doesn't make a difference, I think, on current case.  Was

16   there any grievance on the 2020 or 2021 SAMs?  Yes, that you

17   know of, or Mr. Synvoll.

18           MS. PROSE:  Well, Mr. Tsarnaev has made clear that

19   he is not challenging the SAMs overall.  He did -- he has

20   exhausted his claim, of course, as we conceded involving his

21   communications with nieces and nephews.

22           THE COURT:  Correct.

23           MS. PROSE:  So that has been exhausted.  I don't

24   believe Mr. Tsarnaev has filed any administrative remedies

25   for quite some time.  It would be as reflected in

1  Ms. Trujillo's declaration unless he has done just a few

2  recently.

3          THE COURT:  Understood.

4          MS. PROSE:  Have I answered your question?

5          THE COURT:  Yes, you have.

6          MS. PROSE:  Thank you.

7          THE COURT:  And just -- the two remaining

8  grievances that are part of your summary judgment --

9          MS. PROSE:  Yes.

10          THE COURT:  -- those still remain as restrictions,

11  hobby craft and the photographs?

12          MS. PROSE:  They do.

13          THE COURT:  Okay, thank you.  All right.  I think

14  I have -- do you have anything else that you want to -- I

15  think I have what I need, Mr. Tsarnaev.  Anything else you

16  want to put on the record?  I would also allow you to ask

17  Mr. Synvoll a question if you wanted since I had permitted

18  both sides to proffer information, and I would permit him to

19  ask you a question with people still remaining under the

20  obligation to answer truthfully.

21          Do you have any questions of Mr. Synvoll?

22          MR. TSARNAEV:  No, I don't have any questions for

23  Mr. Synvoll, but I would like to add that I think in the

24  latest filing, defendants provided that if this Court

25  should -- should have ruled in my favor, Your Honor, that it

44

1    would upend the entire administrative process, and I

2    disagree with that.  I think even under Ross, Your Honor,

3    that even Ross demands that (indiscernible) conditions until

4    such administrative remedies as available (indiscernible -

5    audio broke up).

6          So you -- if you were to determine that I did not

7    need to exhaust administrative remedies, it would not upend

8    the process.

9          THE COURT:  Okay.  You started that sentence by

10   saying -- I didn't hear what you said -- I didn't understand

11   what you said at the beginning, that I said or somebody said

12   that Ms. Trujillo should or did grant.  I'm not sure what

13   you said.

14         MR. TSARNAEV:  Oh, okay, okay.  In the very

15   beginning I said that the defendants -- defendants, they

16   worry -- they worry that should you rule in my favor, that

17   this would upend the administrative remedy process.  I'm

18   saying that wouldn't be the case at all, because every

19   single case that I'm aware of, including Ross, they still

20   demand that administrative remedy should be exhausted but

21   conditionally, conditionally to them being a viable means to

22   attain relief.

23         And I think I've proven from my own filings that I

24   was unable to attain relief, and the language -- now that

25   they're changing the language is further proof, Your Honor,

1    that -- it is my belief that I couldn't attain relief.

2          THE COURT:  Understood.  Now, I need to explain

3    something procedurally to you.  Only the defendants have

4    moved for summary judgment.  You have not.  Denying their

5    motion for summary judgment does not get rid of their

6    argument on exhaustion.  It may just mean that it can't be

7    decided at the summary judgment phase.  That's all.  It

8    would not be a finding necessarily that it was futile, but

9    that you have raised a factual issue as to whether it was

10   and that simply has to be part of further proceedings,

11   perhaps a trial of some kind.

12          But you understand that you haven't moved for

13   summary judgment, only they have.  And a denial of summary

14   judgment just means that dispositive relief is not granted

15   at the moment.  Does that make sense?

16          MR. TSARNAEV:  Oh, I see what you're saying.

17          THE COURT:  Okay.  You understood --

18          MR. TSARNAEV:  That makes sense.

19          THE COURT:  You understood that?

20          MR. TSARNAEV:  Yes.

21          THE COURT:  Okay.  Anything else, Mr. Tsarnaev?

22          MR. TSARNAEV:  No, sir, I'm all set.

23          THE COURT:  Okay.  And giving you the same

24   accommodation, Ms. Prose, you may ask him any questions, if

25   you wish.

1          MS. PROSE:  I don't believe I have any questions

2    for Mr. Tsarnaev.  May I have a minute of Your Honor's

3    time --

4          THE COURT:  You may.

5          MS. PROSE:  -- for a very brief remark.

6          THE COURT:  Mr. Tsarnaev was able to put on the

7    record what he wanted and you may do so as well.  So you can

8    consider this both an evidentiary hearing and an oral

9    argument.  Please proceed.

10          MS. PROSE:  I'll make just a few points, Your

11    Honor, thank you very much.

12          This is a futility argument, Your Honor.  That's

13    what this comes down to.  And the Supreme Court has made

14    clear that there time and time and time again, including in

15    Ross, the case that Mr. Tsarnaev points to, that futility is

16    not an exception under the PLRA.  That he is saying I

17    couldn't get what I want, you confused me, and therefore, I

18    didn't have to do it.

19          Not so.  This is not -- this is -- this is

20    absolutely not an exception under the PLRA.

21          I would further point out, Your Honor, that

22    Mr. Tsarnaev's argument, respectfully to him, is belied by

23    his own actions.  After all, in both of those remedies,

24    despite claiming now confusion over the language the warden

25    used, he appealed up, he went up and he went up in both of

1   them, and he simply aborted the process at the central

2   office level.

3        And I think, as Mr. Synvoll pointed out, who knows

4   what would have happened there.  And that is why the Supreme

5   Court has made clear that the exhaustion process must be

6   completed at every level and done so properly.  And, Your

7   Honor, that is what Mr. Tsarnaev needs to do now.  And if he

8   were to do that, his remedies would be -- and appeals would

9   be considered in the context now and he would get a fresh

10  look.  And, Your Honor, we strongly -- we strongly urge that

11  outcome.

12       As the record now stands, though, Mr. Tsarnaev has

13  fallen short of his burden to prove that the process was

14  unavailable.  And again, even if there is some insinuation

15  of a mistake in the warden's language, it didn't keep him

16  from using the process.  But even if he says, Oh, that's

17  wrong, they made a phone call, it wasn't right, mistake also

18  is not a reason under the PLRA, under Ross, under all

19  Supreme Court authority for simply stopping that process mid

20  stream.

21       THE COURT:  It is an interesting question, though.

22  Would futility be an affirmative defense for which he has a

23  burden?  So burdens differ depending on the legal nature of

24  what's being argued.  So are you saying that --

25       MS. PROSE:  Well, he would have the burden to show

1    that the process was unavailable.

2              THE COURT:  Okay.

3              MS. PROSE:  Okay.  We would submit, of course,

4    that Mr. Tsarnaev, respectfully to him, has not met that

5    burden.  But again, when Ross -- when the Supreme Court in

6    Ross talks about unavailability, that doesn't mean there is

7    some confusing language used or some possible, I don't know,

8    way for a prisoner to read something differently or to

9    misread it.  It means that there is affirmative thwarting of

10   the use of the process.  You actually -- you can't get the

11   forms, they won't process it for you.

12             This is never going to be a situation, Your Honor,

13   factually as the record shows, where he would be able to

14   meet that standard.

15             And, Your Honor, again, we emphasize he just needs

16   to do this, and we respectfully suggest that that's what

17   should happen here.

18             Your Honor, we think that you mentioned to Mr. --

19   in your dialogue with Mr. Tsarnaev that, you know, maybe

20   this is going to have to be resolved later on a different

21   record.

22             THE COURT:  No, no, I didn't say that.  All I said

23   was that --

24             MS. PROSE:  (Indiscernible).

25             THE COURT:  -- he since he didn't move for summary

1   judgment, it's not normal to give -- to decide affirmatively

2   that he's correct.

3           MS. PROSE:  I apologize, Your Honor.  That's --

4   yes, I understand, that's fair.

5           But however Your Honor wants to handle that, we

6   submit that this threshold issue should be decided now,

7   should be decided.

8           THE COURT:  Well, I have to, yes.  It's going to

9   be.

10          MS. PROSE:  Yes.

11          THE COURT:  Because all I did with what supplement

12   materials on the the questions that I had, and so the issue

13   of summary judgment is going to result in a decision.

14          MS. PROSE:  Okay.

15          THE COURT:  Yes, as soon as possible.  But one

16   thing you raised was the photograph matter continues, so --

17          MS. PROSE:  And the hobby craft restriction

18   remains in the SAM, too.

19          THE COURT:  No, no, no.  Persists in -- I'm sorry,

20   phone calls persist in this case with nieces and nephews.

21   That you didn't move for summary judgment on, correct?

22          MS. PROSE:  We did not move for summary -- we did

23   not argue that that claim was unexhausted, Your Honor.

24          THE COURT:  Right.  And so --

25          MS. PROSE:  That's correct.  So you have -- you

1    have a claim sitting out there right now that is live.

2           THE COURT:  Do we need -- do we need an answer

3    then?  I don't think you've answered.

4           MS. PROSE:  We haven't.  I believe Your Honor

5    indicated to us that you were going to address that issue

6    subsequently separately and we were going to talk through

7    that issue.  We haven't answered because we have these other

8    two claims.  Let us know if you want us to do this -- it's

9    kind of a strange procedural posture, I think.

10          THE COURT:  It is, but I think from a Rule 1

11   perspective it would probably be appropriate now to go ahead

12   and file a partial answer.

13          MS. PROSE:  We can do so.

14          THE COURT:  Okay.  And then --

15          MS. PROSE:  Absolutely.

16          THE COURT:  Would you like to set a date for a

17   scheduling conference then with you taking the lead and

18   drafting the scheduling order?

19          MS. PROSE:  As to that one claim, Your Honor,

20   or --

21          THE COURT:  Yes, as to just the one claim.

22          MS. PROSE:  Okay.  So we would go forward just as

23   to the one claim.  Okay.

24          THE COURT:  Well, I mean --

25          MS. PROSE:  At this time.

1          THE COURT:  Yeah.  I have to finish my analysis --

2          MS. PROSE:  Sure.

3          THE COURT:  -- and write a supplemental opinion on

4     summary judgment, but either way, I think there is no need

5     to delay whatever limited discovery you would engage in on

6     the claim for which summary judgment has not been brought.

7          MS. PROSE:  All right.  Yes, I can do those things

8     you say, Your Honor.

9          THE COURT:  Do you understand what I'm saying,

10    Mr. Tsarnaev?  That since they did not move on one of your

11    claims, and that's the telephone calls with, I think, six

12    nieces and nephews -- or three, three.  He's allowed six; he

13    doesn't have permission for three of them; is that correct?

14         MS. PROSE:  Your Honor, I apologize.  I'm not sure

15    that those numbers are exactly correct.

16         THE COURT:  Okay.

17         MS. PROSE:  But you're right, there is partial --

18    well, Mr. Tsarnaev can correct me.  I don't believe he

19    currently can speak with any of the nieces by phone.

20         THE COURT:  Okay.

21         MS. PROSE:  Is that right, Mr. Tsarnaev?

22         MR. TSARNAEV:  Yes, that's right.

23         MS. PROSE:  Yeah, yeah.

24         THE COURT:  So you understand that the next

25    process then would be a discovery period, Mr. Tsarnaev,

1  okay?

2          MR. TSARNAEV:  All right.

3          THE COURT:  All right.  And so Ms. Prose will --

4  it's the Court's policy to have the represented party draft

5  an initial scheduling order, which would contain dates by

6  which that discovery has to be completed, as well as a date

7  for a subsequent dispositive motion, another summary

8  judgment, in essence, and then a final pretrial conference

9  if it gets that far.

10          So are you okay with doing that?

11          MS. PROSE:  Yes.

12          THE COURT:  Okay.  And I guess I wouldn't know how

13  to contact Mr. Tsarnaev in the event that we don't need a

14  scheduling conference because using the scheduling order is

15  sufficient.

16          MS. PROSE:  Your Honor, I can -- I can help the

17  Court with that.  We can figure that out.

18          THE COURT:  Okay.

19          MS. PROSE:  Yes.

20          THE COURT:  Well, will you check with Mr. Tsarnaev

21  whether he would like a scheduling conference, and if so,

22  just coordinate with us?

23          MS. PROSE:  Yes.

24          THE COURT:  Okay.

25          MS. PROSE:  So Mr. Tsarnaev, in some form, either

53

1   in person or by mail, I'll be contacting you.  Okay?

2              MR. TSARNAEV:  Very good, Ms. Prose.

3              MS. PROSE:  Thank you.

4              THE COURT:  All right.  Were you done, Ms. Prose,

5   by the way?

6              MS. PROSE:  Your Honor, do you have any other

7   questions for me?

8              THE COURT:  I have no other questions.

9              MS. PROSE:  All right.

10             THE COURT:  Thank you for your appearance today,

11  Mr. Synvoll.  I know it's inconvenient.

12             MS. PROSE:  Your Honor, we appreciate it.

13             THE COURT:  Thank you.  Mr. Tsarnaev, anything

14  further for the record?

15             MR. TSARNAEV:  No, nothing further.  Thank you,

16  Your Honor.

17             THE COURT:  Thank you.  And Ms. Prose?  All right,

18  we stand in recess.

19             (Whereupon, the within audio concluded at 4:13

20  p.m.)

21

22

23

24

25

54

```
1                    TRANSCRIBER'S CERTIFICATE

2          I certify that the foregoing is a correct

3   transcript, to the best of my knowledge and belief (pursuant

4   to the quality of the recording) from the record of

5   proceedings in the above-entitled matter.

6

7   /s/Dyann Labo                    September 23, 2022

8   Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com